# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 14, 2017   Decided August 1, 2017

No. 15-1135

FRED MEYER STORES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 15-1167

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Mitchell J. Cogen* argued the cause and filed the briefs for petitioner.

*Eric Weitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

Before: BROWN, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by BROWN, *Circuit Judge*.

BROWN, *Circuit Judge*: Petitioner Fred Meyer Stores, Inc. ("Fred Meyer") operates big-box stores—selling both grocery and non-food goods—in the northwest United States. It operates several stores in the Portland, Oregon area, including the Fred Meyer Hillsboro Store (the "Store") at issue here. On October 15, 2009, an encounter between Fred Meyer employees and representatives of the United Food and Commercial Workers Union (the "Union")[1] escalated and resulted in the arrests of three individuals. Affirming the prior decision of an Administrative Law Judge ("ALJ"), the National Labor Relations Board ("Board" or "NLRB") held Fred Meyer had committed various unfair labor practices in its interaction with the Union.[2] Fred Meyer now petitions for review of the Board's decision.

---

[1] The Union, as relevant to this case, is comprised of the "Local 555," the smallest entity covering the Store, and its "International," a larger division of the same Union.

[2] The ALJ issued his decision in this matter on December 8, 2010. *Fred Meyer Stores*, No. 36-CA-10555, 2010 WL 5101099 (Dec. 8, 2010). The Board issued its initial Decision and Order in this matter on December 13, 2012. *Fred Meyer Stores, Inc.*, 359 N.L.R.B. 316 (2012) ("*2012 Board Opinion*"). The 2012 Order was set aside after the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). On April 30, 2015, a properly-constituted Board panel considered the record *de novo* and issued the Decision and Order now before the Court. *Fred Meyer Stores, Inc.*, 362 N.L.R.B. No. 82 (2015) ("*2015 Board Opinion*").

3

I.

The Collective Bargaining Agreement ("Access Agreement") between the Union and Fred Meyer set the conditions upon which non-employee Union representatives may visit the Store. The relevant provision states:

It is the desire of both the Employer and the Union to avoid wherever possible the loss of working time by employees covered by this Agreement. Therefore, representatives of the Union when visiting the store or contacting employees on Union business during their working hours shall first contact the store manager or person in charge of the store. All contact will be handled so as to not interfere with service to customers nor unreasonably interrupt employees with the performance of their duties.

JA 578; *see also* JA 29 (ALJ Opinion misquoting the Access Agreement). The parties had also developed an agreed-upon practice, memorialized in a memorandum, for Union representative visits:

Business agents have the right to talk BRIEFLY with employees on the floor, to tell those employees they are in the store, to introduce themselves, and to conduct BRIEF conversations, as long as the employees are not unreasonably interrupted. Such conversations should not occur in the presence of customers.

Business Representatives have the right to distribute fliers to employees on the floor AS LONG AS IT IS DONE QUICKLY, THE EMPLOYEES ARE NOT URGED TO STOP WHAT THEY ARE DOING TO READ THE MATERIALS AT THAT TIME, AND

> FURTHER, THAT THE MATERIALS ARE NOT PASSED OUT IN THE PRESENCE OF CUSTOMERS.
>
> Business agents have the right to distribute materials in the break room. Lengthy conversations and discussions should always take place in the break room . . . .

*See 2015 Board Opinion*, 362 N.L.R.B. No. 82 at \*1 n.3 (quoting the written procedures). Over the course of their twenty-year history, the parties had agreed conversations of up to two minutes may occur on the sales floor. While not discussed in the memorandum, the Union also limited itself to two Union representatives in the Store at any given time—often a single Union representative, and occasionally, an accompanying trainee. Where prior visitations had escalated into disputes, Fred Meyer called the police, and the Union representatives left of their own accord.

But then things changed. Bargaining for successor Union contracts began in July 2008,[3] and in November of that year, the leadership of Local 555 shifted. The new Union President called in reinforcements from the International, and Jenny Reed ("Reed") arrived to energize the Union's efforts. During August and September of 2009, the two months immediately prior to the incident at issue here, representatives visited the Local 555 stores more frequently and twice arrived at Fred Meyer stores (but not the Hillsboro Store) with three or four representatives. By September 25, 2009, Local 555 leadership declared itself a "FIGHTING UNION" and promised it would do whatever was necessary to further its interests. JA 56 (ALJ Opinion), 767–71; *see also* JA 252–53.

---

[3] New contracts were finalized in 2010.

On October 14, 2009, Store manager Gary Catalano ("Catalano") engaged in a heated discussion with Union representatives at the Store. The exchange ended with a threat from the Union representative to return the following day with reinforcements. *See* JA 34 (ALJ Opinion quoting Catalano's recollection of the Union representative's statement: "[W]ell what if I just bring in 15 or 20 more people tomorrow and we just do our thing tomorrow . . . ?"). Catalano discussed the interaction with his superior Cindy Thornton ("Thornton"), who generated a protocol to follow if multiple representatives descended upon the Store: (1) Catalano would reiterate the visitation practice; (2) Catalano would ask representatives to leave the Store; (3) Loss Prevention, the Store's security team, would ask the representatives to leave the Store; and (4) Catalano would telephone Thornton again and, with her permission, call the police. Catalano held a meeting with his managers, including Home Department Manager James Dostert ("Dostert"), to train them on the policy.

The Union also prepared for confrontation. Members of Local 555 and the International convened and devised a plan to send several representatives into the Store the following day. The Union anticipated its actions would prompt a response from Fred Meyer, and its members conducted a training session in order to "be able to deal" with events at the Store the next day. JA 35 (ALJ Opinion), 361–63. For example, they decided Reed would "take [the] arrest" if matters escalated. JA 35 (ALJ Opinion).

The showdown occurred on October 15, 2009. A team of eight individuals arrived at the Store around 9:30 a.m. The Union contingent included Reed and Joe Price from the International along with Brad Witt ("Witt"), Kevin Billman, Mike Marshall ("Marshall"), Kathy MacInnis ("MacInnis"), and Jeff Anderson from Local 555. Witt, an Oregon State

Representative at the time, also asked his campaign manager, a local freelance photographer, to join them in hopes of "get[ting] a story." JA 36 (ALJ Opinion).[4] The group carpooled to the site and entered the Store simultaneously, fanning out in pairs to different entrances. Only Reed and Witt went to the Customer Service Desk to check in. They also took the unusual step of asking to speak face-to-face with the Manager on Duty. Since Catalano was off that day, Dostert met with Reed and Witt.

Here, the stories diverge. The NLRB asserts Dostert told the two representatives "their contact with employees on the store floor would be limited to identification and introductions and that any additional communications would need to take place in the breakroom." *2015 Board Opinion*, 362 N.L.R.B. No. 82 at *2. Fred Meyer, on the other hand, argues Dostert explained the Union representatives had a "right to walk the floor, engage with associates for a minute or two, hand out your card; anything lengthier than that needs to go to the break room." JA 472.

Thereafter, Reed held up a piece of paper and said she and Witt had a right under "federal law" to "talk to [employees] as long as [they] wanted to." JA 41 (ALJ Opinion). After further discussion, Reed told Dostert he was violating federal law, and he could be arrested. Dostert then called Thornton, who reiterated the long-standing policy—which had been re-confirmed the prior day—and instructed Dostert to again explain the Union representatives may conduct brief

---

[4] There is some dispute regarding whether the freelance photographer—the eighth individual—is properly considered a member of the Union team. We do not decide this issue here, but both the ALJ and Board consistently referred to "eight" Union representatives. *See, e.g.*, JA 35, 50, 161, 194 n.7. We will follow this convention here.

conversations on the sales floor and longer conversations would need to occur in the breakroom. The conversation between Dostert, Reed, and Witt continued, growing ever more heated, and Dostert attempted to move the discussion away from customers. During this period, Local 555 vice-president Shaun Barkeley ("Barkeley") phoned Thornton and rebuffed an offer from her to sit down and talk about the Union's concerns with the current policy, stating "you do what you have to do and I'll do what I have to do." JA 44 (ALJ Opinion quoting Thornton's recollection of Barkeley's response).

Reed then approached Store cashier Alicia England ("England") and abruptly handed her a piece of paper; England moved away. By then, Dostert had received a number of calls informing him that multiple Union representatives were present in the Store. He phoned Thornton a second time to relay the news; she again stated the policy and asked Dostert to repeat it once again to the Union representatives, informing them that if they did not comply, they would need to leave the Store. Reed and Witt again refused to comply or depart. At some point in this interaction, while still near England, Dostert began angrily disparaging the Union, stating among other things: union representatives are "jerks," unions are "outdated and ridiculous," and union dues are "ridiculous." JA 39–40 (ALJ Opinion), 42 (same), 75–79, 827–29.

Dostert subsequently called the Store's Loss Prevention Manager, Mike Kline ("Kline"), who explained the Store's trespass rules and asked Reed and Witt to leave. Shortly after Kline arrived, Dostert received a call; while Dostert was speaking on the phone, Witt got in Dostert's face and repeatedly yelled "liar!"[5] JA 432, 483. After the call ended—

---

[5] The ALJ did not discuss this point. Nonetheless, in the absence of an adverse credibility finding with regard to the relevant testimony, the fair inferences that can be drawn from it must be made.

and Kline had instructed Witt to back off—the other five Union representatives joined the group around Dostert. Following a phone conversation with Thornton, Dostert asked Kline to call the police.

Hillsboro Police Officers Daniel Mace ("Officer Mace") and Victor Kamenir ("Officer Kamenir") arrived around 10:10 a.m. After Dostert again asked Reed to leave the Store, Officer Mace explained to Reed that, under Oregon trespass law, she was obliged to leave and would be taken into custody if she refused. Reed refused and was arrested. The other representatives in the Store obeyed the instruction to leave. Marshall and MacInnis then walked through the parking lot to the carpool vehicles, but they were unable to unlock the cars and waited in the parking lot for the drivers. Sergeant Matthew Shannon ("Sergeant Shannon"), who had arrived on the scene, told Marshall to leave the property. Thereafter, Marshall became agitated and "tried to engage the [S]ergeant." JA 308. The scene became "a little hairy" and got "a little out of hand," so backup units were called. JA 502–03. After offering Marshall several opportunities to leave the premises, Officer Kamenir placed him under arrest. MacInnis was not arrested.

Finally, Local 555 President Dan Clay ("Clay") arrived at the scene, identified himself to Sergeant Shannon, and told the Sergeant to "look at the Federal law before he arrest[ed] people." JA 46 (ALJ Opinion quoting Clay's testimony). Clay proceeded to inform Sergeant Shannon that the arrests of Reed and Marshall were illegal, at which point Sargent Shannon told him "another word and you're done." JA 47 (ALJ Opinion quoting Clay's testimony). Clay continued to argue and

---

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998) (holding that the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands").

refused to leave, at which point Sergeant Shannon instructed Officer Kamenir to arrest Clay.

The NLRB affirmed the ALJ's finding that Fred Meyer had changed "longstanding and contractually-based practice" and committed unfair labor practices "by limiting the union agents' right to contact store employees," "telling employees not to speak to the union representatives, disparaging the Union in the presence of employees, threatening to have union representatives arrested, and causing the arrest of three union representatives." *2015 Board Opinion*, 362 N.L.R.B. No. 82 at *1, *3. The Board's Order requires the Company to make Reed, Marshall, and Clay whole for any costs arising from their arrests and post a remedial notice at its union-represented stores covered by the Access Agreement. A dissenter, Member Johnson, disagreed with the Board's findings regarding the representatives' ability to speak with Union employees on the Store floor; the events leading up to the arrests of Reed, Marshall, and Clay; and certain statements by manager Dostert (excluding the order to a unit employee not to speak with the Union representatives).

## II.

"Judicial review of NLRB determinations in unfair labor practice cases is generally limited, but not so deferential that the court will merely act as a rubber stamp for the Board's conclusions." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445 (D.C. Cir. 2004). We will affirm an order of the Board if its findings with respect to questions of fact are supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 160(e). "Substantial evidence" is "less than a preponderance of the evidence," albeit "more than a scintilla." *Multimax, Inc. v. FAA*, 231 F.3d 882, 887 (D.C. Cir. 2000). More specifically, it "requires not the degree of evidence which

satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998). The question before the Court, therefore, "is not whether [Fred Meyer's] view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is reasonably defensible" and one which a reasonable factfinder would support. *Inova Health Sys. v. NLRB*, 795 F.3d 68, 81 (D.C. Cir. 2015).

A.

It is well-established that employers can generally prohibit labor organization activities by nonemployee union representatives conducted on business property. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992). In fact, "[N]onemployee organizers cannot claim even a limited right of access to a nonconsenting employer's property until after the requisite need for access to the employer's property has been shown." *Id.* at 534. Accordingly, any right of the Union representatives to enter the Store on October 15 must derive from the parties' Access Agreement and past practice, not federal law. Put another way, nonemployee union agents on an employer's premises for the purpose of communicating with represented employees are engaged in activities protected by Section 7 of the National Labor Relations Act, 49 Stat. 452, *as amended*, 29 U.S.C. § 157 ("NLRA" or the "Act"), *only to the extent* that they comply with the parties' contractual access clause. Even the Board acknowledges this simple proposition. It begins its analysis, as it must, with the text of the parties' Access Agreement and the nature of their past practice; from there, it analyzes the parties' actions. *2015 Board Opinion*, 362 N.L.R.B. No. 82 at*1–*2. Moreover, in order to establish a NLRA violation, the General Counsel of the NLRB carries the burden to show the Union representatives were in compliance

with the parties' Access Agreement. *See NLRB v. Great Scot, Inc.*, 39 F.3d 678, 684 (6th Cir. 1994) (finding reversible error where the burden was incorrectly placed on the employer).

Here, the record—if not the ALJ decision or the opinions of the Board—clearly reflects a violation of the Access Agreement. All parties agree that the Union representatives entered the Store on October 15 without checking in as required by the parties' contract. Even the ALJ acknowledged this undisputed fact should be dispositive. *See* JA 49 n.16 (ALJ Opinion stating, "The test of any misconduct herein therefore is an objective one as opposed to subjective. Thus the test is not what misconduct the Respondent's deciding agents believed occurred by the union agents at the store at relevant times but rather what misconduct did in fact occur."). As of the moment the Union representatives walked through the doors to the Store without notifying management of their presence—at least 5 minutes before Dostert first opened his mouth and long before anyone was arrested—they had become trespassers Fred Meyer could lawfully expel from the Store. *Cf. Times Publ'g Co.*, 72 N.L.R.B. 676, 683 (1947) ("[A]lthough the Act imposes no affirmative duty to bargain upon labor organizations, a union's refusal to bargain in good faith may remove the possibility of negotiation and thus preclude the existence of a situation in which the employer's own good faith can be tested. If it cannot be tested, its absence can hardly be found.").

Inexplicably, however, counsel for Fred Meyer has deprived us of this straightforward disposition by failing to present to the Board argument regarding the Union representatives' failure to check in. *See* 29 U.S.C. § 160(e). Counsel's omission diverts us onto a long and lumbering road. Nevertheless, as discussed below, inconsistencies in the Board's opinion require us to remand this matter to the Board

to consider whether the union representatives lost the protection of the Act.

B.

Our review of NLRB decisions is "limited," *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011), and "a decision of the NLRB will be overturned only if the Board's factual findings are not supported by substantial evidence, or the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case," *Pirlott v. NLRB*, 522 F.3d 423, 432 (D.C. Cir. 2008). Here, the Board behaved in an arbitrary and capricious manner by failing to engage in reasoned decisionmaking. In assessing the Board's decision, we must ensure it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfgs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Board's decision is arbitrary if it "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Id.* Accordingly, our deferential standard of review applies only where "the process by which [the Board] reaches [a] result" is "logical and rational"—in other words, the Agency has engaged in "reasoned decisionmaking." *Allentown Mack*, 522 U.S. at 374.

Having carefully examined both the Board's findings and its reasoning, we conclude the Board's opinion is more disingenuous than dispositive; it evidences a complete failure to reasonably reflect upon the information contained in the

record and grapple with contrary evidence—disregarding entirely the need for reasoned decisionmaking. *See Haw. Dredging Constr. Co. v. NLRB*, 857 F.3d 877, 881–82 (D.C. Cir. 2017). The Board totally ignores facts in the record and misconstrues the findings of the ALJ. *See Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1282 (D.C. Cir. 1999) ("The court must take account of anything in the record that fairly detracts from the weight of the evidence supporting the Board's conclusion."). Even clear statements by the dissent pointing out the inconsistencies did not dissuade the Board's majority. *See Haw. Dredging*, 857 F.3d at 881; *see also Am. Gas Ass'n v. FERC*, 593 F.3d 14, 20 (D.C. Cir. 2010) ("While FERC is not required to agree with arguments raised by a dissenting Commissioner, it must, at a minimum, acknowledge and consider them."). In a concession to brevity, we examine only two particularly outrageous instances here.

*First*, and most egregiously, the Board stated the ALJ had found "the parties did not have a clearly defined practice with regard to the number of union agents permitted to be in a store at any one time." *2015 Board Opinion*, 362 N.L.R.B. No. 82 at *1. From this premise, the Board concluded "[t]he visitation policy does not limit the number of representatives that may visit a store at one time." *Id.* at *3. But the ALJ made no such finding on this central issue. Instead, he stated:

> *I have made no findings* respecting either the reasonableness of having eight visiting Union agents in a store at one time under the [relevant] contract language . . . or whether or not such actions were, as of October 15, 2009, inconsistent with past practice. I find that I simply do not need to because the question is irrelevant to the resolution of the complaint allegations.

JA 56 (ALJ Opinion) (emphasis added). The Board's mischaracterization is all the more pernicious because it relied upon its assertion of the ALJ's "finding" to resolve a central, disputed issue in the case: whether or not the Union representatives violated the Access Agreement and lost protection under the NLRA.[6] The Board's tone deafness—even after the dissent drew attention to the error—is the antithesis of "reasoned decisionmaking."

*Second*, the Board asserted, without citation, "Reed disagreed with Dostert's instructions" directing her to conduct conversations regarding the petition in the breakroom, "and she offered to show him a copy of the parties' contractual visitation policy. Dostert declined to read or consider the policy." *2015 Board Opinion*, 362 N.L.R.B. No. 82 at *2. No such finding of fact pertaining to the pivotal exchange appears in the ALJ's opinion. To the contrary, the ALJ acknowledged many of the events taking place when Witt and Reed "checked-in" with Dostert were the subject of *intense* debate. And while the ALJ spent substantial time discussing the initial words exchanged between Reed, Witt, and Dostert and the proceedings leading up to the arrests, he expressly declined to determine precisely what occurred at each step of the heated discussion that continued in the interim. JA 51 (ALJ Opinion noting conduct during that conversation was "in dispute"). Specifically, he stated,

---

[6] We note the ALJ's opinion is a bit confused on this issue, also stating "[t]here is no doubt that union practice typically involved one agent at a time, with two agents occasionally." JA 31 (ALJ Opinion). Regardless, the ALJ certainly did not find "no[] limit" on the number of Union representatives simultaneously visiting the Store, as the Board now claims. *See 2015 Board Opinion*, 362 N.L.R.B. No. 82 at *3.

> The running conversation of the three — Dostert/Reed/Witt, as I chose to label it, was lengthy, moved several times within the store and . . . involved others. I do not find that everything that Dostert testified he or others stated in that conversation should be discredited or that Witt or Reed was complete or perfect in his or her testimony.

JA 55 (ALJ Opinion). The Board's assertion, a statement that goes to the heart of the disputed issues in the case, is therefore the product of unmoored supposition rather than reasoned decisionmaking.

In short, the Board—purposefully or absentmindedly—misrepresented several of the ALJ's findings and failed to respond to key points raised by the dissent. We cannot defer to a Board that has not adequately considered the issues raised by the parties; accordingly, we remand for the Board to determine whether the Union representatives are entitled to the protection of the Act.

### III.

The Court next considers the arrests of Reed, Marshall, and Clay. Since the arrests were caused primarily by the Union representatives' refusal to obey the orders of police officers, we reverse the Board's findings on this matter.

The NLRA was "designed to protect *both* individual and collective rights, and ha[s] as [its] paramount goal the promotion of labor peace through the collective efforts of labor and management." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 447 (D.C. Cir. 2004). Consistent with this purpose, once Reed and Witt believed Dostert's original articulation of the visitation policy narrowed their ability to speak with Store employees, they had two options: (1) briefly protest,

explaining what they believed the correct policy permitted or (2) grieve the matter through formal channels. Their right to remain in the Store, therefore, endured for only a few minutes after they began speaking with Dostert. And it evaporated completely once Reed and Witt continued to engage in a loud and heated discussion several minutes later, even after Thornton's (indisputably correct) view of the policy had been discussed.

It is axiomatic that an employer, even an employer running a union shop, may generally avail itself of the assistance of law enforcement and press trespassing charges against those impermissibly occupying its property following a direction to leave. *Baptist Memorial Hosp.*, 229 N.L.R.B. 45, 46 (1977) (finding employer liability only where the arrest "stemmed solely from [the employer's] persistent effort to maintain and enforce its unlawful policies and to thwart the protected organizational activities of its employees").

The Board's brief correctly points out that Dostert had summoned the police, informed the police that he wanted the Union representatives removed from the premises, and looked on without intervening as the police arrested all three Union representatives for criminal trespass. In the words of the ALJ Opinion, the "causation [was] linear." JA 58. But, as the Board has held, a violation occurs only where an employer "engage[s] in conduct that has the intended and foreseeable consequence of interfering with employee Section 7 rights." *Wild Oats Mkts., Inc.*, 336 N.L.R.B. 179, 181 (2001); *see also Baptist Memorial Hosp.*, 229 N.L.R.B. at 46 (holding an employer liable where an arrest "stemmed solely from the [employer's] persistent effort to maintain and enforce its unlawful policies and to thwart the protected organizational activities of its employees"). Indeed, this policy is consistent with the intent of the Act; the NLRA, like all federal statutes, "should be read

against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled on other grounds*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 664 (1978).

Here, the intervening illegal acts of Reed, Marshall, and Clay—each refusing to obey an order issued by a police officer—break the chain of causation between Dostert's actions and the arrests. On all prior occasions, Union representatives had left the Store when disputes arose—either on their own or after encouragement by a police officer. On October 15, 2009, however, the Union representatives departed from their prior practice and escalated their interactions with police officers. Neither the Board nor the ALJ focused on this exchange. Instead, they held—without further analysis—that Dostert's violation of the Act created a duty to prevent the Officers from arresting the Union representatives. Nonetheless, the record covers extensively the events that transpired once the Officers arrived. *See LCF, Inc. v. NLRB*, 129 F.3d 1276, 1281 (D.C. Cir. 1997) ("[T]his court's analysis considers not only the evidence supporting the Board's decision but also whatever in the record fairly detracts from its weight."). Viewed through the proper legal lens, the evidence demonstrates the Union representatives' own behavior led to their arrests.

The testimony of the Officers present at the Store clearly indicated the Union representatives were arrested because they "refused to comply with police instructions." JA 522.[7] Officer

_____

[7] The record indicates the scene at the Store was anything but calm. By the time Officer Mace's superior, Sergeant Shannon, joined him on the scene, the confrontation had escalated to the point that Sergeant Shannon "call[ed] for code 3 cover," which Officer Mace described as a call for all on-duty police officers to rush to the scene

Mace testified that if Reed had "followed [his] instruction" to leave, he "would have had no reason to" arrest her. JA 500. Instead, "she just stuck her hands out" to be handcuffed and, in Officer Mace's words: "[W]hat am I going to do at that point?" JA 499. Marshall and Clay had argued with the police officers and "didn't listen" to the Officers' commands. In fact, Marshall and Clay admit they were warned that if they did not leave they would be arrested. JA 309 (Marshall testimony recalling the police said "you need to leave, you need to leave. I said, sergeant, can I please speak with you? He was continuing to say, you need to leave."); 338 (Clay testimony recalling "[t]he officer turned back and said [I] need[ed] to leave . . . he basically said no more discussion, or else I was going to be arrested"). After several failed attempts to encourage the men to leave the scene, the officers arrested them. Under these circumstances—where the individuals arrested had broken with prior practice and then failed to obey the Officers' commands despite repeated opportunities to comply and avoid arrest—we can hardly say the arrests amounted to a violation on the part of Fred Meyer. *See generally Borquez v. City of Tucson*, 475 F. App'x 663, 665 (9th Cir. 2012) ("Considering that Borquez approached an officer leading an arrestee to a police vehicle, verbally challenged the officer's actions, and grabbed the arm of the officer, we conclude that a reasonable officer in Pacheco's position could have believed that probable cause existed to arrest Borquez for interfering in governmental operations . . . .").[8]

_____

with "lights and sirens." JA 502, 511. He observed "[t]he whole city showed up, officer-wise" and explained police officers "don't make [code 3 cover] calls lightly" due to the risk that officers rushing to the scene could injure citizens in their haste. JA 511–12.

[8] Fred Meyer also argues the First Amendment protects its decision to call the police and immunizes the Store for the resulting arrests.

19

Under the circumstances, we find Fred Meyer's actions did not constitute a NLRA violation, and we reverse the Board's conclusions regarding the arrests. *See Skyline Distributors v. NLRB*, 99 F.3d 403, 410 (D.C. Cir. 1996) (examining the record and reversing in part despite finding the Board's opinion "so lacking in evidentiary support and reasoned decisionmaking that it seems whimsical").

## IV.

Finally, the Court considers the anti-union statements allegedly uttered by Dostert near employee England. An employer violates Section 8(a)(1) of the Act if he makes statements with a "reasonable tendency" to "interfere with, restrain, or coerce" an employee's exercise of his statutory rights. *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001); 29 U.S.C. § 158(a)(1). Therefore, an employer's statements "must be viewed in context and not in isolation to determine if they [had] the reasonable tendency proscribed by Section 8(a)(1)." *Turtle Bay Resorts*, 353 N.L.R.B. 1242, 1278 (2009). "It is well settled that the Act countenances a significant degree of vituperative speech in the heat of labor relations. Indeed, words of disparagement alone concerning a

---

*See United Mine Workers v. Pennington*, 404 U.S. 508 (1972); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). Unfortunately, this point was not addressed before the Board, and the Court is jurisdictionally barred from entertaining it absent "extraordinary circumstances." 29 U.S.C. § 160(e); *Alden Leeds*, 812 F.3d at 166–68. In light of the Court's disposition of this matter, we do not reach the question whether Fred Meyer forfeited its First Amendment claim pertaining to the arrests.

union or its officials are insufficient for finding a violation of Section 8(a)(1)." *Id.*[9]

All parties admit that immediately after informing England that she could not speak with the Union representative, Dostert stated union representatives are "jerks;" unions are "outdated and ridiculous;" union dues are "ridiculous;" employees "did not need a union;" the Union stole money from its members; and he did not believe in unions. JA 26 (ALJ Decision), 37 (same); *2015 Board Opinion*, 362 N.L.R.B. No. 82 at *2. According to Witt's testimony, Dostert later said "he had his boss'[s] backing and that the union reps were going to be removed from the store." JA 378. Even assuming employee England heard these statements—a matter the parties now dispute—Dostert's anti-union comments and threats to remove non-employee Union representatives were not sufficiently coercive to establish a violation of the Act as a matter of law.

These statements, while no doubt intemperate and ill-advised, do not constitute the type of threat required to render an employee's speech impermissibly coercive. Indeed, Dostert's outburst seemed to have been a response to considerable provocation: Witt interrupting his phone call by calling him a liar; Reed ignoring his instruction and insisting there could be no restriction on the length of her conversations with employees; and Dostert receiving multiple calls reporting that Union representatives who had not checked in were contacting employees in violation of the Access Agreement. Under the circumstances, a reasonable onlooker would interpret Dostert's statements as an expression of frustration

---

[9] Because we conclude that Dostert's statements did not have a "reasonable tendency" to "coerce," 29 U.S.C. § 158(a)(1), we do not need to determine whether they are protected under 29 U.S.C. §158(c).

directly responding to the events that had just transpired, not a threat or even a statement of forward-looking policy.

The facts of *Turtle Bay* are instructive. There, a manager "engaged in a[n unprovoked] tirade" against a union organizer present in the workplace cafeteria that "included a threat to discipline any employee who talked to" the organizer. *Turtle Bay Resorts*, 353 N.L.R.B. at 1278. Moreover, the employer "put teeth in his threat . . . by saying the NLRB did not control him and he was not interested in what the NLRB did." *Id.* The Board found the employer's "disparagement of [the organizer], coupled with his threat to discipline any employee who talked to [the organizer], ha[d] a reasonable tendency to coerce employees or interfere with Section 7 rights in violation of Section 8(a)(1)." *Id.* at 1279. Clearly, the statements at issue in *Turtle Bay* were highly inflammatory and included a direct threat to discipline employees for engaging in protected activity; combined with the speaker's cavalier attitude while instigating a confrontation with the organizer, they could have been viewed by a reasonable employee as coercive. Here, however, making general negative statements about unions and then threatening to do what an employer has the lawful right to do is entirely distinguishable.[10]

## V.

In short, the Board's actions in this matter are more consistent with the role of an advocate than an adjudicator. Accordingly, Fred Meyer's petition is granted, and the Board's cross-application for enforcement is denied. The case shall be

---

[10] Any First Amendment argument regarding Dostert's alleged anti-union statements has been forfeited by Petitioner. Although such an argument might be dispositive in a future case, we will leave that question for another day.

remanded to the Board for further consideration consistent with this Opinion.

*So ordered.*