GRUENDER, Circuit Judge, concurring in part and dissenting in part. By its own terms, the National Labor Relations Act (“NLRA”) is designed to protect workers, not unions. See 29 U.S.C. § 157; see also, e.g., Lechmere, Inc. v. NLRB, 502 U.S. 527, 532, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992) (“[T]he NLRA confers rights only on employees, not on unions or their nonemployee organizers.”). Notwithstanding this clear statutory mandate, the Board’s decision protects a union at the expense of employees. It does so by trumpeting several alleged unfair labor practices (“ULPs”), the majority of which are unsupported by substantial evidence. Because I believe that “[t]he wrongs of the parent should not be visited on the children, and the violations of [this employer] should not be visited on these employees,” Overnite Transp. Co., 333 N.L.R.B. 1392, 1398 (2001) (Member Hurtgen, dissenting), I respectfully dissent from the bulk of the court’s opinion.[6] I. Southern Bakeries (“SBC” or “the Company”) operates a commercial bakery in Hope, Arkansas. SBC began operations in 2005, when it purchased assets from the defunct Meyer’s Bakeries and hired most of its employees. As Meyer’s successor, SBC recognized the Bakery, Confection-ary, Tobacco Workers and Grain Millers International Union, Local 111 (“BCTGM” or “the Union”) as the collective-bargaining agent for the two hundred or so employees in its production and sanitation unit. The Company and the Union subsequently entered into several collective bargaining agreements (“CBAs”), the most recent of which expired in February 2012. Employee-led efforts to remove BCTGM started a few years after SBC took over the bakery. In 2009, an SBC employee filed a “decertification petition” seeking to oust BCTGM. The National Labor Relations Board (“NLRB” or “the Board”) held an election, but a majority of employees voted to retain the Union. Two years later, employee Nadine Pugh led another decer-tification campaign. Although a majority of unit employees called for BCTGM’s ouster in this new petition, the' Union filed “blocking charges.” SBC ultimately settled the allegations with the Board without admitting fault, but the Board never held an election. In May 2012, employee-amicus John Hankins filed yet another decertification petition that was signed by 59 percent of unit employees. This prompted the NLRB to schedule a new decertification election for February 7, 2013. Over the intervening eight months, SBC and the Union continued a long-running dispute over BCTGM’s access to the facility. Also during the campaign period, in January and early February 2013, SBC made its opposition to the Union known in several ways. First, the Company posted a memorandum suggesting that the Union was planning to lead a strike similar to one it organized at Hostess Bakeries, which SBC tied directly to the loss of more than 18,000 jobs at Hostess. Second, SBC’s executive vice president and general manager, Rickey Ledbet-ter, gave a series of captive-audience speeches intended to highlight certain negative facts about unionization. These speeches were critical of unions in general and of BCTGM in particular. For instance, Ledbetter repeatedly referenced the Hostess layoffs and suggested that unions had “strangled” Hostess and a variety of companies in other industries. At the same time, Ledbetter assured employees that SBC would not retaliate if BCTGM won the election and pledged to continue bargaining with the Union if it were retained. Additionally, he told employees, “If any of you are harassed or threatened on any basis during this election campaign, regardless of whether you are for or against the [UJnion, we want to know about it immediately so we can address the problem, just as we always have. We will not tolerate the abuse of any employee rights in this work place.” See ante at 822 (emphasis added). After these speeches, the Union filed another set of blocking charges, and the NLRB once again postponed the election pending an investigation.[7] Undeterred, but frustrated by what he considered to be stall tactics, Hankins changed strategy. Based on the advice of the National Right to Work Foundation, he and another employee circulated a “withdrawal petition,” which would allow for the end of BCTGM representation without an election. Out of 200 unit employees, 66 percent signed the withdrawal petition calling for the Union’s ouster. In July 2013, after verifying the authenticity of the signatures, SBC withdrew recognition of BCTGM, denied further Union access to the plant, ceased dues checkoffs, and, several months later, raised employee wages by an average of 27 cents per hour. In response, the NLRB Regional Director filed a consolidated complaint against SBC with the Board on January 10, 2014. An administrative law judge (“ALJ”) held a four-day hearing on the matter' the following month. In mid-July 2014, the ALJ issued a decision finding that SBC committed a series of ULPs that together “spawned significant disaffection.” Specifically, the ALJ held that SBC had violated section 8(a)(1) of the NLRA, by interrogating employees about their union activities, making unlawful campaign statements, promulgating a harassment-reporting rule, and disparaging the Union; sections 8(a)(3) and 8(a)(1), by investigating and disciplining certain employees; and sections 8(a)(5) and 8(a)(1), by unilaterally installing two cameras in the break area, changing BCTGM’s access rights, wrongfully withdrawing recognition of the Union, and unilaterally raising employee pay after the BCTGM’s ouster. See ante at 819-20 (explaining the specific allegations in greater detail). Based on these findings, the ALJ ordered SBC to recognize and bargain with BCTGM as the collective-bargaining representative for unit employees, among other remedies. Prior to the issuance of the ALJ decision, in February 2014, the NLRB Regional Director sought section 10(j) injunctive relief in federal court to force SBC to bargain with BCTGM. On August 14, 2014, the district court granted the NLRB’s request to reinstate the Union with immediate effect. SBC then appealed the grant of the injunction, and we reversed in McKinney ex rel. NLRB v. S. Bakeries, LLC, 786 F.3d 1119, 1126 (8th Cir. 2015). Specifically, we held that the district court abused its discretion in granting the injunction because there was no threat of irreparable-harm in allowing the case to go through the Board’s normal adjudicatory process. Id. at 1125. Central to this holding was the fact that “the Union lacked majority support for nearly two years before the Director filed her § 10(j) petition.” See id. While acknowledging that there was no need to “resolve whether the Company’s allegedly unlawful activities caused the employees’ disaffection [reflected in the withdrawal petition],” id. at 1124, we found that “the unrefuted evidence before us indicate[d] a majority of [SBC] employees ha[d] not supported the Union since at least May 2012 when Hankins circulated his first petition,” id. In other words, although the February 2013 vote had been canceled, there was no indication that the petition represented anything other than a “genuine reflection of employee sentiment,” id. at 1124 n.5, confirming evidence that BCTGM “had long been out of favor,” id. at 1125. Meanwhile, both parties filed exceptions to the initial ALJ decision, and a three-member panel of the Board adopted the ALJ’s findings and conclusions in nearly all respects. S. Bakeries, LLC, 364 N.L.R.B. No. 64, at *1 (Aug. 4; 2016). Where the Board departed, it did so in favor of the Union. For example, the Board accepted the NLRB General Counsel’s exceptions regarding SBC’s promulgation of a harassment-reporting rule and interrogation of employees. Id. at *1, *5-7. It also affirmed the ALJ’s determination that SBC engaged in various unlawful campaign activities. Id. at *2-5. Member Miscimarra dissented as to the findings concerning campaign statements, the harassment-reporting rule, and disparagement of the Union. Id. at *9-10 (Member Miscimarra, dissenting in part). Additionally, the Board ordered the reinstatement of the Union. SBC now appeals this order, as well as each of the ULP findings, and the Board cross-petitions for enforcement of its order. II. My primary concern with the Board’s decision is that, based on a number of questionable findings, it imposes BCTGM on an unconsenting group of workers who have repeatedly indicated a desire to be free from its representation. Worse still, the resulting harm to employees could go on indefinitely, as the bargaining order blocks any future decertification election until the NLRB determines that a “reasonable time” has passed. See Lee Lumber & Bldg. Material Corp. v. NLRB, 117 F.3d 1454, 1460 (D.C. Cir. 1997) (per curiam). Given my view that “the Board’s actions in this matter are more consistent with the role of an advocate than an adjudicator,” see Fred Meyer Stores, Inc. v. NLRB, 865 F.3d 630, 642-43 (D.C. Cir. 2017), I would not make employees wait any longer to exercise their free will. “We review appeals from the National Labor Relations Board with deference,” NLRB v. Hardesty Co., Inc., 308 F.3d 859, 862 (8th Cir. 2002), and “[w]e will enforce the Board’s order if [it] correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole,” ConAgra Foods, Inc. v. NLRB, 813 F.3d 1079, 1084 (8th Cir. 2016) (quotation omitted); see also Fred Meyer Stores, 865 F.3d at 636 (“Judicial review of NLRB determinations in unfair labor practice cases is generally limited, but not so deferential that the court will merely act as a rubber stamp for the Board’s conclusions.” (citation omitted)). While we defer to the Board’s interpretation of the NLRA so long as it is rational and consistent with the statute, Cellular Sales of Mo., LLCv. NLRB, 824 F.3d 772, 775 (8th Cir. 2016), we review all other conclusions of law de novo, and we are “not obligated to defer to [the Board’s] interpretation of Supreme Court precedent under Chevron or any other principle,” Owen v. Bristol Care, Inc., 702 F.3d 1050, 1054 (8th Cir. 2013) (quotation omitted). As for factual findings, we have explained that “Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” ConAgra Foods, 813 F.3d at 1084 (citation omitted). We also are required, however, to consider adverse .evidence and to weigh the strengths and weaknesses of the Board’s inferences. Nichols Aluminum, LLC v. NLRB, 797 F.3d 548, 553 (8th Cir. 2015). While the Board is permitted to draw reasonable inferences based on the record, it cannot rely on “suspicion, surmise, implications, or plainly incredible evidence.” Id. (citation omitted). Because several of the Board’s conclusions regarding the alleged violations of sections 8(a)(1) and 8(a)(5) either are not supported by substantial evidence or are based on a misapplication of governing law, I respectfully dissent from the portions of the court’s opinion upholding these findings. A. Section 8(a)(1) violations Section 7 of the NLRA guarantees employees “the right ... to form, join, or assist labor organizations, to bargain collectively ... and to engage in other concerted activities for the purpose of collective bargaining [as well as] the right to refrain from any or all of such activities.” 29 U.S.C. § 157. Section 8(a)(1), in turn, makes it an unfair labor practice for employers “to interfere with, restrain, or coerce employees in the exercise of [their] rights” under section 7. Id. § 158(a)(1). At the same time, an employer retains the right to communicate to employees “any of his general views about unionism or any of his specific views about a particular union ... so long as the communications do not contain a ‘threat of reprisal or force or promise of benefit.’ ” NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (quoting 29 U.S.C. § 158(c)); see also Fred Meyer Stores, 865 F.3d at 642 (“[W]ords of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1).” (citation omitted)); Children’s Ctr. for Behavioral Dev., 347 N.L.R.B. 35, 35 (2006) (“[A]n employer may criticize, disparage, or denigrate a union without running afoul of Section 8(a)(1), provided that its expression of opinion does not threaten employees or otherwise interfere with the Section 7 rights of employees.”)- See generally U.S. Const, amend. I. The Board found that SBC committed eight ULPs under section 8(a)(1), and the court affirms five of these determinations. See ante at 821-22, 822-24. I believe that the Board erred in its conclusions concerning three of the remaining five purported unfair labor practices—that SBC threatened plant closure, promised benefits, and promulgated an unlawful rule—because its findings impermissibly relied on suspicion and implications and failed to adequately account for adverse evidence. 1. Threats of plant closure The Board’s conclusion that SBC unlawfully threatened plant closure involved three related errors. First, the Board incorrectly applied the Supreme Court’s decision in NLRB v. Gissel Packing Co. by implying that Ledbetter’s statements were predictions about “precise effects.” See 395 U.S. at 618, 89 S.Ct. 1918. Second, the Board misinterpreted as threats Ledbet-ter’s comments about the potential economic effects of union retention. Finally, the Board gave insufficient weight to the -numerous instances in which SBC expressed its commitment to continue bargaining with the Union if it were retained, mitigating any reasonable perception of a threat. a. No predictions of “precise effects” The Board applied the wrong standard in concluding that Ledbetter’s campaign statements were unlawful because they were not “carefully phrased, on the basis of objective fact.” See S. Bakeries, 364 N.L.R.B. No. 64, at *4 (quoting Gissel, 395 U.S. at 618, 89 S.Ct. 1918). Under Gissel, not all campaign speech is required to meet this stringent standard. See 395 U.S. at 618, 89 S.Ct. 1918. Rather, the “carefully phrased” requirement applies only to an employer’s statements that “make a prediction as to the precise effects he believes unionization will have on his company.” Id. (emphasis added). Notwithstanding the Board’s insinuations to the contrary, the record betrays no indication that Ledbetter made a single “prediction” of the “precise effects” that retaining BCTGM would have on employees, such as layoffs or closure. Instead, as dissenting Member Miscimarra explained, “Ledbetter merely conveyed general views about unionization (e.g., that unions have ‘strangled’ companies in various industries) and views on a particular union (that the BCTGM had contributed to the demise of Hostess).” S. Bakeries, 364 N.L.R.B. No. 64, at *15 (Member Miscimarra, dissenting in part). Even Ledbetter’s statements about the potential impact that a retention vote could have on SBC’s success in a competitive market were cabined to general observations about how unions can affect a company’s ability to compete. “Of course the employees are free to draw their own conclusions therefrom, but employee conclusions are certainly not to be viewed as employer predictions.” Michael’s Markets, 274 N.L.R.B. 826, 826 (1985); see also Crown Cork & Seal Co. v. NLRB, 36 F.3d 1130, 1134 (D.C. Cir. 1994) (finding that a letter could not be read to threaten plant closure because it linked job preservation to the plant’s ability to compete regardless of unionization); EDP Med. Comput. Sys., Inc., 284 N.L.R.B. 1232, 1264 (1987) (holding that employers have a “right to ... stat[e] ‘economic reality’ by informing employees of [unionized companies that had closed].”). The Board erroneously imposed Gissel’s “carefully phrased” requirement on all campaign speech involving “predictions.” However, as the D.C. and Sixth Circuits have held in interpreting Gissel, such general commentary does not trigger the “carefully phrased” standard. See, e.g., Flamingo Hilton-Laughlin v. NLRB, 148 F.3d 1166, 1173 (D.C. Cir. 1998) (concluding that statements such as “loss to employees was an inevitable consequence of their unionizing” are “partisan, but largely permissible”); NLRB v. Pentre Elec., Inc., 998 F.2d 363, 369 (6th Cir. 1993) (“[A]n employer may make predictions of consequences that will occur no matter how well disposed the company is toward unions, and such predictions are not unlawful threats of retaliation ... [where] nothing in the record demonstrates that the predicted consequences were driven by [the employer’s] desire to punish employees for a pro-union vote”), abrogated on other grounds by Holly Farms Corp. v. NLRB, 517 U.S. 392, 409, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996). These circuits instead preserve the “highly desirable [exchange of ideas wherein] employees involved in a union campaign ... hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right.” NLRB v. Lenkurt Elec. Co., 438 F.2d 1102, 1108 (9th Cir. 1971). As such, I would follow these courts in concluding that there are campaign predictions, like Ledbetter’s, that do not trigger the “carefully phrased” requirement. b. Economic predictions and historic references The Board also erred by misconstruing SBC’s campaign statements as threats of plant closure. While there is often a risk that employer predictions concerning the consequences of unionization could be interpreted as a pledge to effectuate them, that danger alone is insufficient to convert such predictions into unlawful threats of reprisal. See NLRB v. Village IX, Inc., 723 F.2d 1360, 1367 (7th Cir. 1983) (distinguishing between predictions of inevitability and threats of retaliation). Based on their plain meaning, the comments at issue here merely conveyed SBC’s opinions as to the potential economic repercussions that might accompany union retention, based in part on a historical reference to the Hostess layoffs and other past plant closures. Nevertheless, in a single, conclusory sentence, the court suggests that SBC’s references to the Hostess closure and Ledbet-ter’s speeches were “phrased to predict that unionization would inevitably cause the plant to close” and thus constituted an implicit threat against union retention. See ante at 821 (quoting NLRB v. Noll Motors, Inc., 433 F.2d 853, 856 (8th Cir. 1970)). Yet, “as the dictionaries tell us, a ‘threat of reprisal’ means a ‘threat of retaliation’ and this in turn means not a prediction that adverse consequences will develop but a threat that they will be deliberately inflicted in return for an injury—‘to return evil for evil.’ ” Crown Cork & Seal Co., 36 F.3d at 1138 (citation omitted). “For a statement to constitute a threat, it must at least purport to describe an action the speaker or author of the statement may take.” S. Bakeries, 364 N.L.R.B. No. 64, at *12 (Member Miscimarra, dissenting in part). Neither the court nor the Board point to a single instance where Ledbetter predicted “the precise effects that continued unionization would have on the Hope bakery, and he certainly did not either state or predict that the Hope bakery would close unless employees voted to de-certify the Union.” Id. at *15. In discussing how SBC might respond to retention, Ledbetter did not so much as hint at retaliation or otherwise imply that the Company would “throw employees out of work regardless of the economic realities.” See Gissel, 395 U.S. at 619, 89 S.Ct. 1918. Rather, he described only what the Union might do and the economic impact that could result. An employer is free to tell employees “what he reasonably believes will be the likely economic consequences of unionization that are outside his control,” as distinguished from “threats of economic reprisal to be taken solely on his own volition.” Id. at 619, 89 S.Ct. 1918 (citation omitted). Otherwise, “[i]f § 8(c) does not permit an employer to counter promises of pie in the sky with reasonable warnings that the pie may be a mirage, it would indeed keep Congress’ wor[d] of promise to the ear but break it to the hope.” NLRB v. River Togs, Inc., 382 F.2d 198, 202 (2nd Cir. 1967). Accordingly, I believe the Board erred by inferring unlawful threats from SBC’s economic predictions about unionization and references to relevant historic events. c. Commitment to continued good-faith bargaining The final consideration weighing against the Board’s finding that SBC threatened plant closure is that SBC repeatedly and consistently committed to bargain with the Union if employees voted for retention. In his speeches, Ledbetter reiterated this point in various ways, such as: “I want to stress that if the [U]nion were somehow to win the eléction and continue to represent you, we wouldn’t reduce wages, benefits, or working conditions just because the [UJnion won.” These and other similar pledges led Member Miscimarra to conclude that SBC effectively conveyed the sentiment that “[the Company] would continue to bargain in good faith with the Union ... [and] would not retaliate by making unfavorable changes ‘just because the [U]nion won.’ ” S. Bakeries, 364 N.L.R.B. No. 64, at *16 (Member Misci-marra, dissenting in part). The Board inexplicably discounted these statements solely on the basis of the general anti-union tenor of the campaigning speeches. This represents a failure to properly consider adverse evidence. In sum, I believe the Board’s conclusion that SBC implicitly threatened plant closure is not. supported by substantial evidence because the campaign statements at issue did not involve predictions of precise effects, because these statements cannot reasonably be interpreted as threats, and further, because SBC assured employees of its willingness to continue bargaining with the Union if it were to win retention. 2. Promises of beneñts The Board’s finding that SBC unlawfully promised benefits is likewise unsupported by substantial evidence. As noted above, SBC has a statutorily protected right to comment on the potential economic consequences of unionization. See River Togs, 382 F.2d at 202 (citing 29 U.S.C. § 158(c)). Further, employers “may make truthful statements to employees concerning benefits available to their represented and unrepresented employees, may compare wages and benefits at their unionized and non-unionized facilities, and may offer an opinion, based on such comparisons, that employees would be better off without a union.” Unifirst Corp., 346 N.L.R.B. 591, 593 (2006). Here, SBC provided employees with wage information for non-represented employees, which showed that these workers received higher pay and more frequent raises than their unionized colleagues. Also, in one speech, Ledbetter said, “If you think about the issue logically, you will know the answer to the question of what will happen to your wage, benefits and working conditions if the ... [U]nion is voted out.” Yet, earlier in the same speech, he described SBC’s desire to work with the Union to find a balance between competitiveness, wages, and job security. The Board read these expressions as an implied promise of wage increases in exchange for decertification. In reality, however, the statements merely explained that SBC would have more money if not for the expenses associated with unionization— such as administrative costs and legal fees—and suggested that some of the added funds could flow to employees. Of course, employees also would enjoy direct savings by avoiding union dues. In these respects, this case is similar to Deer Creek Mining Co., 308 N.L.R.B. 743 (1992). There, the Board found no implied promise, in an employer’s verbal acknowledgement that “the costs of existing union benefits plans were so high that the [employer] could not afford to pay them without reducing existing wages.” Id. at 743. Similarly, Ledbetter’s statements conveyed objective economic facts beyond SBC’s control. As such, substantial evidence does not support the conclusion that SBC made an implied promise of benefits. 3. Harassment-reporting rule While I accept the Board’s finding that SBC’s application of its harassment-reporting policy violated section 8(a)(3), I disagree that the promulgation of this rule was itself an independent violation of section 8(a)(1)—if indeed Ledbetter’s comment can be interpreted as a rule at all. See S. Bakeries, 364 N.L.R.B. No. 64, at *17-18 (Member Miscimarra, dissenting in part) (“Ledbetter did not issue a generally applicable directive or rule, and he did not threaten anyone with discipline if they neglected to report being harassed or threatened. Rather, Ledbetter indicated a desire to know if anyone were threatened or harassed.”). It strains credulity to suggest that encouraging employees to report harassment would “reasonably tend to chill employees in the exercise of their Section 7 rights,” see Lafayette Park Hotel, 326 N.L.R.B. 824, 825 (1998), enforced, 203 F.3d 52 (D.C. Cir. 1999). The court cites Bank of St. Louis v. NLRB in support of its position that the promulgation of a harassment-reporting requirement constitutes a ULP. See ante at 822 (citing 456 F.2d 1234, 1235 (8th Cir. 1972) (per curiam)). However, Bank of St. Louis involved a rule requiring employees to report only union-solicitation activities. 456 F.2d at 1235. Ledbetter’s neutral harassment-reporting policy—which covered all employees, “whether [they were] for or against the union”—is far different. Furthermore, employees could not “reasonably construe” the plain wording of SBC’s purported rule to prohibit protected speech, as it targeted only harassment, which falls outside the protection of section 7. The Board ignores the fact that “[h]arassment and intimidation are not protected union activities” and that “offensive, hostile language and threats are not protected even if under the guise of union activity.” NLRB v. Arkema, Inc., 710 F.3d 308, 316 (5th Cir. 2013). Although employees are certainly allowed to engage in union solicitation and employers cannot treat this protected activity as harassment, SBC has a right and a responsibility to create a workplace environment free from harassment and threats. See Martin Luther Mem’l Home, Inc., 343 N.L.R.B. 646, 648-49 (2004) (holding that rules prohibiting harassment were lawful because “employees have a right to a workplace free of unlawful harassment, and both employees and employers have a substantial interest in promoting a workplace that is ‘civil and decent’ ” (citation omitted)). The timing of Ledbetter’s statement coincided with the period when harassment was most likely to occur, the prohibited conduct is clearly distinguishable from legitimate solicitation, and the context of the alleged rule, taken together, suggest that SBC wanted to protect against abusive activity in light of an increasingly acrimonious campaign.- Moreover, the policy contained no threat of sanction and applied to both sides of the debate; it simply was an invitation to employees on all sides to bring incidents of harassment to the attention of the Company. This neutral wording also belies the argument that the policy was promulgated in response to protected activity. Unlike the court, I would not require employers to hesitate before acting to maintain order in the workplace for fear of being held to task by the Board. B. Section 8(a)(5) violations Section 8(a)(5) makes it “an unlawful labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees.” 29 U.S.C. § 158(a)(5). An employer violates this section by failing to notify or bargain with a union before changing the terms and conditions of employment. While I agree with the court that SBC impermissibly installed two surveillance cameras in the break area without negotiation, I respectfully dissent from its findings that the Company violated section 8(a)(5) by restricting Union access to the facility, withdrawing recognition of the Union in July 2013, and increasing wages shortly thereafter. 1. Union access rights First, the Board lacked substantial evidence to support its finding that SBC “prohibit[ed] all access between March and November 2012, and at other times thereafter.” S. Bakeries, 364 N.L.R.B. No. 64, at *31-32 (emphasis added). At most, SBC temporarily barred one BCTGM representative (Cesar Calderon) after repeatedly warning him qf numerous violations of the CBA and denied access to a second representative (David Woods) until he read the terms of the CBA—both while expressing a willingness to allow visits from other nonemployee union representatives. As the D.C. Circuit recently explained, “nonemployee union agents on an employer’s premises for the purpose of communicating with represented employees are engaged in activities protected by Section 7 of the [NLRA] only to the extent that they comply with the parties’ contractual access clause.” Fred Meyer Stores, 865 F.3d at 637. Accordingly, “to establish a NLRA violation, the General Counsel of the NLRB carries the burden to show the Union representatives were in compliance with the parties’ Access Agreement.” Id. (citation omitted). Because the CBA created only a limited visitation right “for the purpose of seeing that the Agreement is being observed” and because BCTGM violated the terms of the CBA on numerous occasions, I believe SBC had the right to exclude the two representatives in question. More importantly, the Board offered no evidence rebutting SBC’s claim that it would have allowed other Union representatives to visit during the alleged period of exclusion. Thus, because the Board failed to meet its burden and because substantial evidence does not support its factual determinations, I would conclude that SBC did not violate section 8(a)(5) by restricting union access. 2. Withdraw of recognition Second, I disagree that SBC unlawfully withdrew recognition from BCTGM as the unit’s collective-bargaining representative because the Union had lost majority support, thereby compelling—or, at the very least, permitting—the Company to take this course of action. See Tenneco Auto., Inc. v. NLRB, 716 F.3d 640, 648 (D.C. Cir. 2013) (“When an employer has objective evidence that a union has lost majority support, such as ‘a petition signed by a majority of the employees in the bargaining unit,’ it may unilaterally withdraw recognition.” (citation omitted)); Levitz Furniture Co., 333 N.L.R.B. 717, 724 (2001) (holding that, “[u]nder Board law, if a union actually has lost majority support”—as opposed to its status merely being in doubt—“the employer must cease recognizing it” (emphasis added)). As the court correctly notes, however, employers are not permitted “to rely on a union’s loss of majority support caused by the employer’s own unfair labor practices.” See ante at 827 (quoting Radisson Plaza Minneapolis v. NLRB, 987 F.2d 1376, 1383 (8th Cir. 1993)). Thus, the crux of this issue—and the very heart of this appeal—centers on whether the Company’s ULPs caused employees disaffection with the Union. Because I believe that the Board lacked substantial evidence to establish a causal link between any remaining unfair labor practices and the Union’s loss of support, I would reverse the Board decision as to this finding and vacate its order reinstating BCTGM. “Gissel bargaining orders,” which compel employers to recognize a union, are an “extreme remedy” and are “justified only in ‘exceptional circumstances’ ” because they deny employees free choice regarding unionization. Skyline Distribs. v. NLRB, 99 F.3d 403, 411 (D.C. Cir. 1996) (citations omitted); see also id. at 410 (“[A] bargaining order is not a snake-oil cure for whatever ails the workplace.” (citation omitted)). In fact, “[t]here could be no clearer abridgment of § 7 of the Act ... [than] granting] exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority.” Int’l Ladies’ Garment Workers’ Union v. NLRB, 366 U.S. 731, 737, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). For this reason, “courts have been strict in requiring the Board to justify [such] orders” and have required an explanation as to why a less intrusive remedy would be inadequate. Skyline Distribs., 99 F.3d at 410-11. Gissel bargaining orders cannot be enforced simply because an employer engaged in even “numerous unfair labor practices,” see Harper & Row Publishers, Inc. v. NLRB, 476 F.2d 430, 435 (8th Cir. 1973), as “not every unfair labor practice will taint evidence of a union’s subsequent loss of majority support,” Lexus of Concord, Inc., 343 N.L.R.B. 851, 852 (2004). Instead, “the Board has the burden of adducing substantial evidence to support its finding that an employer’s unfair labor practices have ‘significantly contributed’ to the erosion of a union’s majority support.” Tenneco, 716 F.3d at 648 (citation omitted). Where, as here, “the unfair labor practices do not involve a general refusal to recognize and bargain with the union, ‘there must be specific proof of a causal relationship between the unfair labor practice[s] and the ensuing events indicating a loss of support.’” Champion Enters., Inc., 350 N.L.R.B. 788, 791 (2007) (citation omitted).[8] Thus, although I acknowledge that SBC committed a few ULPs, the question is not whether the Company engaged in unfair labor practices; it is whether there is substantial evidence showing that these labor practices caused or reasonably could have caused employee disaffection with the Union. I believe that the Board committed two errors in finding such a causal nexus here. First, the Board ignored our decision in McKinney, which found that BCTGM had lost majority support long before the May 2012 decertification petition. See 786 F.3d at 1124. If the Union already had lost majority support, it is unclear to me how SBC could have caused this disaffection through subsequent acts. Second, although the ALJ decision correctly identified the correct framework for analyzing causation based on the oft-cited opinion in Master Slack Corp., 271 N.L.R.B. 78, 84 (1984), its analysis was conclusory at best, and neither the Board nor the court offer any additional basis for finding causation. a. Eighth Circuit precedent confirms pre-ULP loss of majority support “[Ejvidence that employee disaffection arose prior to, and independently of, the [employer’s] unfair labor practice conduct is relevant [to the inquiry into causation]” and thus the Board has an obligation to consider it as adverse evidence. Lexus of Concord, Inc., 343 N.L.R.B. at 852-53. In McKinney, we found that “the unrefuted evidence ... indicated that] a majority of Southern Bakeries’ employees ha[d] not supported the Union since at least May 2012 when Hankins circulated his first petition.” 786 F.3d at 1124. This petition was signed by 59 percent of unit employees. Additionally, dating back to 2009, SBC workers struggled to oust the Union with steadily growing momentum. This undisputed history demonstrates the Union lost majority support prior to May 2012. The Board failed to adequately address this adverse evidence, thereby calling into question its causal determination. While McKinney did not find it immediately necessary to “resolve whether the Company’s allegedly unlawful activities [before the 2012 decertification petition] caused the employees’ disaffection,” id., it did note that “the Director has not pointed to evidence suggesting the 2012 petition is not a genuine reflection of employee sentiment,” id. at 1124 n.5.1 believe this still to be the case. In attempting to undermine the petition as a valid expression of employee will, the court latches onto the only ULP alleged to have occurred prior to May 2012—the temporary bar on BCTGM representative Cesar Calderon’s access to the bakery. See ante at 827-28. This, the court suggests, was sufficient to cause the employee disaffection that gave rise to the decertification petition. See ante at 827-28. As an initial matter, based on my analysis in the previous section, I do not believe that substantial evidence supports the Board’s finding that the restriction on Calderon’s access was an unfair labor practice. However, even if it was a ULP, I do not believe that the Union lost majority support simply because one of its representatives was absent for a few weeks—if so, its foothold at SBC was tenuous indeed. Therefore, McKinney demonstrates that BCTGM lost majority support irrespective of any ULP committed after May 2012, and the Board failed to adduce substantial evidence undermining that conclusion. b. Master Slack factors Separate and apart from McKinney, I disagree with the Board’s finding that substantial evidence established a causal nexus between unfair labor practices and employee disaffection. This is especially true given that the ULPs actually supported by substantial evidence are fewer and much less severe than what the Board originally found. Based on my analysis, I believe that SBC committed only three ULPs that could, have affected the June 2013 withdraw petition: (1) creating an impression of surveillance, (2) interrogating several pro-Union employees, and (3) disciplining those same employees. These three ULPs are simply too isolated and minor to have caused the Union’s loss of majority support. However, even assuming that the court is correct in upholding the additional three ULPs of threatening plant closure, promising benefits, and promulgating an unlawful rule, the Board still failed to meet its burden of adducing substantial evidence to show a causal nexus between these labor practices and employee disaffection. The Board did not even engage with the issue of causation in its decision, instead adopting the ALJ’s analysis of the issue in its entirety. The ALJ began by correctly identifying the Master Slack factors as the governing approach for deciding whether a causal relationship exists. Under this framework the Board considers: “(1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.” Master Slack, 271 N.L.R.B. at 84. However, the ALJ dedicated a mere four sentences to its causal analysis, which included little more than a conclusory recitation of the alleged ULPs. Without a deeper examination of how the Company’s actions could have influenced the employees, I cannot agree with the court’s bald declaration that the ALJ’s causal-disaffection determination was supported by substantial evidence. See ante at 827-28. Indeed, a fuller Master Slack analysis suggests the opposite conclusion. First, the length of time between the alleged ULPs and the circulation of the withdrawal petition weighs in favor of the Union. Although there is some uncertainty as to what constitutes a sufficiently short amount of time, compare Columbia Portland Cement Co. v. NLRB, 979 F.2d 460, 465 (6th Cir. 1992) (holding violations within one year had sufficient temporal proximity), with Tenneco, 716 F.3d at 649 (“[A] lapse of months fails to support, and typically weighs against, a finding of' close temporal proximity.”), it is clear that a strong temporal nexus exists where an employer’s unlawful conduct was ongoing at the time of the petition, see Goya Foods of Fla., 347 N.L.R.B. 1118, 1121 (2006), enforced, 525 F.3d 1117 (11th Cir. 2008). I agree with the Board’s finding that SBC violated section 8(a)(3) in March and May 2013, just before the withdrawal petition was circulated. Thus, temporal proximity supports the Board’s finding of a causal nexus, at least for some of the ULPs. The second and third factors—the nature of the violations and their likelihood to cause employee disaffection—cut against finding a causal nexus. The ULPs here are so innocuous that they could not have had a lasting impact on employees or caused widespread loss of Union support. Moreover, neither the ALJ nor the court point to evidence that employees were even aware of the offending labor practices. Instead, the ALJ relied on sheer speculation to bridge the gap between the charged ULPs and employee’s choice by simply pronouncing that SBC’s unfair labor practices were “so voluminous and egregious that they naturally spawned significant disaffection.” This approach plainly fails to establish “specific proof of a causal relationship.” See Champion Enters., 350 N.L.R.B. at 791. Even assuming that SBC committed all of the ULPs that the court upholds, the Board failed to produce substantial evidence suggesting that these practices had an effect sufficient “to cause a large majority of the employees to sign a decertification petition.”[9] Tenneco, 716 F.3d at 650-51. Compared with instances where employers terminated employees, refused to bargain with a union, or unilaterally granted benefits to employees, the Board’s attempt at bundling a group of fairly minor ULPs to create the illusion of a coercive atmosphere holds little water. The fourth factor—the effect of unlawful conduct on union membership—also cuts in favor of SBC because the Board again failed to identify evidence linking the impression of surveillance or disciplining of three employees to the Union’s loss of majority support. The Board’s reliance on the fact that Union support declined after a few alleged ULPs confuses temporal correlation with causation, “rest[ing] more on suspicion than on reasonable inference and upon resort to that shopworn logical fallacy, post hoc ergo propter hoc.” See Riveredge Hosp., 205 N.L.R.B. 931, 935 (1973). Once again, even accepting the additional ULPs the court upholds, there is no evidence of causation beyond mere temporal correlation. Indeed, in light of the years-long trend of diminishing support for BCTGM, it is difficult to find that the ULPs had any effect on employee sentiment. Thus, nothing more than pure inference justifies the conclusion that the ULPs caused employee disaffection with the Union. Despite the lip service paid to the Master Slack factors, the ALJ seemingly rested its causality determination on the same paternalistic assumption that undergirds many NLRB decisions in this context— that employees are incapable of navigating the election process and making a reasonable, independent decision that advances their own best interest. Admittedly, there can be a fine line between coercion and persuasion in the context of an employer-employee relationship, and employers certainly are capable of unfairly influencing employee sentiment through ULPs. See, e.g., UARCO, Inc., 286 N.L.R.B. 55 at 79 (“[T]he Board has often found that employees, who are particularly sensitive to rumors of plant closings ... take such hints as coercive threats rather than honest forecasts.”). Nevertheless, “[i]t is the very essence of election campaigning ... to convince the voter not to support the other party,” Mediplex of Conn., Inc., 319 N.L.R.B. 281, 289 (1995), and an employer’s ULPs should not be assumed to have caused employee disaffection unless there is evidence that the specific labor practices influenced, or reasonably could have influenced, employees’ choice. Attempts to persuade frequently involve disparaging the other side’s position, and we must give unions and employers latitude to engage in a spirited debate given the importance of the issues at stake. See, e.g., MikLin Enterprises, Inc. v. NLRB, 861 F.3d 812, 837 (8th Cir. 2017) (en banc) (Kelly, J., dissenting) (“By limiting the content of employees’ communications to attacks on the employer’s labor practices ... the court deprive[s] employees of ... their most cogent argument ...[,] dampen[s] the ardor of labor debate[,] and truncate[s] the free discussion envisioned by the Act.” (quotations omitted)). When coupled with the findings from McKinney showing that a majority of employees stopped supporting the Union well before most of the alleged ULPs, the Board utterly disregarded “material evidence that belie[d] any causal relationship between the Company’s unfair labor practices and the employees’ petition for decer-tification” and failed to satisfy the Master Slack factors. See Tenneco, 716 F.3d at 649. Based on this record, I do not believe that there is substantial evidence of a causal relationship between SBC’s unfair labor practices and the Union’s loss of majority support. Therefore, I would not enforce this portion of the Board’s order.[10] III. The Board’s decision suggests that SBC can neither reference the potential negative economic impacts of retaining the Union “regardless of the truth of those claims because it will upset the tranquility of the voter,” Mediplex, 319 N.L.R.B. at 289, nor commit even a single ULP without automatically trammeling the right of employees to rid themselves of an unwanted Union. Unfortunately, what often gets lost in disputes like this are the unique interests of employees, as distinct from either those of the companies or unions themselves, despite the NLRA’s clear mandate “to protect the rights of individual employees.” 29 U.S.C. § 141(b). And because either the Union or SBC may be more closely aligned with those interests depending on the circumstances, we should be more concerned with enabling employees to “recogniz[e] campaign propaganda for what it is” rather than protecting them from the exchange of ideas. See U-Haul Co. of Nevada, Inc., 341 N.L.R.B. 195, 195 (2004). In fact, in the present ease, there is good reason to believe that the employees were more sophisticated than most regarding the decision of whether to retain union representation, as they had been through a previous decertification election in 2009 and witnessed firsthand that SBC did not close its doors or otherwise retaliate after BCTGM prevailed. This case “demonstrates the lengths to which the Board will go to contort an evenhanded Act into an anti-employer manifesto,” DirecTV, Inc. v. NLRB, 837 F.3d 25, 47 (D.C. Cir. 2016) (Brown, J., dissenting). Rather than checking this agency overreach, the court’s decision today rubber-stamps a bargaining order that sacrifices the will of employees for the sake of union incumbency. . While I might have reached a different conclusion if unencumbered by the deference we accord agency determinations, I concur in sections II.A.6-7 and II.B as to the findings that Southern created an impression of surveillance, interrogated certain employees, and unlawfully investigated and disciplined these employees. I also agree that Southern did not communicate that unionization was futile, disparage unions, or threaten discipline or other reprisals, per sections II.A.2, II.A.5, and II.A.8. . As this court once observed in another blocking-order case, "it appears clearly infer-able ... that one of the purposes of the Union in filing the unfair practice charge[s] was to abort [the] petition for an election.” See NLRB v. Hart Beverage Co., 445 F.2d 415, 420 (8th Cir. 1971). See generally Brief for John Hankins as Amicus Curiae at 2 n.2 (discussing the strategic use of blocking charges). . I acknowledge that some of our sister circuits have adopted a presumption that the commission of any ULP taints subsequent expressions of employee disaffection, even without proof of causation. See, e.g., Columbia Portland Cement Co. v. NLRB, 979 F.2d 460, 465 (6th Cir. 1992) (citing Fifth and Sixth Circuit cases requiring only that a ULP “reasonably tended to contribute to employee disaffection” and rejecting the need for a stricter causal showing). However, I would follow' the D.C. Circuit’s approach, which insists on direct proof of a causal nexus between alleged ULPs and a union’s loss of majority support. The former approach, adopted by the Board, would allow any ULP, no matter how trivial, to thwart decertification. The folly of this approach becomes clear by imagining, for example, that the only unfair labor practice SBC committed was replacing the break-room window with plywood. Certainly, no one would find this to be a sufficient basis for concluding that SBC caused a loss of union support, but the Board's approach requires precisely that result. . Although there is precedent indicating the coercive nature of several of these ULPs, I do not believe such violations can serve as per se proof of causation. This is especially true where, as here, there is evidence that most employees were not even aware of the practices or at least of their alleged, anti-union impetus. For example, SBC did not make a public example in disciplining the pro-Union employees, and Hankins testified that their names never came up during the withdrawal-petition process. Similarly, although there was an ongoing dispute about the Union’s access rights, there is nothing in the record showing that BCTGM was ever denied access for legitimate purposes or that the alleged limitations “actually prevented communications between the employees and the Union.” See Tenneco, 716 F.3d at 650-51. The Union was even provided with a list of the employees eligible to vote in the election and thus had the means of contacting them directly, unlike Tenneco. . Based on the foregoing analysis, I reject the Board’s determination that the wage increases violated section (8)(a)(5), as SBC was no longer obligated to bargain with the Union when it granted the raises. See ante at 825 n.4. Accordingly, I also would not enforce this portion of the Board's order.