Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 13, 2004        Decided May 28, 2004

No. 03-1277

NATIONAL FEDERATION OF FEDERAL EMPLOYEES,
FD–1, IAMAW, LOCAL 1442,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

On Petition for Review of an Order of the
Federal Labor Relations Authority

*Susan Tsui Grundmann* argued the cause for petitioner. With her on the briefs was *Richard J. Hirn*.

*David M. Shewchuk*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief were *David M. Smith*, Solicitor, and *William R. Tobey*, Deputy Solicitor.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before:   EDWARDS, SENTELLE, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  This case involves a collective bargaining agreement that gives a union ten days after receiving notice of a change in working conditions to request bargaining.  Although the union failed to request bargaining within ten days of when the employer first notified it about the closure of an employee child-care center, the union did request bargaining within ten days of receiving a subsequent notice stating that the center would in fact close several years later than indicated in the earlier notice.  The Federal Labor Relations Authority ruled that the union waived its right to bargain over the closure by failing to request bargaining within ten days of receiving the first notice.  But because under Authority precedent unions must receive adequate notice of a proposed change—including the planned timing of the change—before they have any obligation to request bargaining, we conclude that the revised timing information in the second notice gave the union a new opportunity to request bargaining.  We therefore grant the union's petition for review.

## I.

Petitioner, Local 1442 of the National Federation of Federal Employees, represents non-professional employees at the U.S. Army's Letterkenny Depot in Chambersburg, Pennsylvania.  For years, the depot provided child-care services for both military and civilian employees.  Union members not only sent their children to the depot's three child-care centers, but also worked there.

In April 1997, the depot's director of personnel and community activities sent a handwritten note to the union president, as well as to the presidents of three other unions that represent depot employees, regarding a decision by the Base Realignment and Closure Commission (BRAC) to transfer many of the depot's activities elsewhere.  The note attached a list of "morale, welfare, and recreation activities" that the depot expected to discontinue because of the BRAC trans-

fer—a list that included the three child-care centers—along with a projected time frame for the discontinuation of each. The projected time frame for the three centers was "September 1998/March 1999."

Although the union and the depot had a collective bargaining agreement that gave the union ten days after receiving notice of a change in working conditions to request bargaining, the union did not invoke this right after receiving the handwritten note. Instead, it submitted the child-care issue to the Labor–Management Partnership Council, a group composed of representatives from management and the four depot unions. The Council "provide[s] a forum for labor and management representatives to come together in full partnership to discuss issues critical to the depot [and] to make decisions on those issues." Pet'r's Br. at 4 (internal quotation marks omitted).

In February 1999, with the child-care issue still on the Council's agenda, the depot announced that the Child Development Center (CDC), encompassing the depot's two child-care programs for pre-school children, would remain open until June of that year. It also announced that the School Age Services program (SAS), the third center and the one at issue in this case, would remain open until the end of August. After the CDC closed in June, the union filed an unfair labor charge, but the FLRA regional director declined to issue a complaint, in part because he concluded that the union's failure to request negotiations within ten days of the 1997 handwritten note—or, at the latest, within ten days of the depot's February 1999 announcement—waived the union's right to bargain under the collective bargaining agreement.

Meanwhile, the SAS remained open long after August 1999. In January 2001, the depot notified the four union presidents that the SAS would close on August 31 of that year. Less than ten days later the union requested bargaining over the closure, a request the depot initially agreed to. At their first bargaining session, management and the union reached agreement on four of the union's five proposals. The fifth proposal remained unresolved, however, even after the two sides were joined at a second session by a federal mediator.

A further session with the mediator was scheduled but then canceled when the depot took the position that it actually had no obligation to bargain with the union regarding the closure of the SAS. Adopting the reasoning that the FLRA regional director had offered in declining to issue a complaint about the CDC closure, the depot contended that by failing to request bargaining within ten days of the 1997 handwritten note, the union waived its right to negotiate over the SAS closure.

The union filed an unfair labor practice charge, but following a hearing an administrative law judge rejected the charge, accepting the depot's view that by failing to request bargaining in 1997 within the time period specified by the parties' collective bargaining agreement, the union waived its right to bargain over the SAS closure. (Although the Federal Labor Relations Act does not include a ten-day limitations period, Authority precedent, unchallenged by the union, recognizes contractual limitations periods when evaluating the timeliness of bargaining requests. *See, e.g.*, *Dep't of the Air Force Materiel Command, Wright–Patterson Air Force Base*, 51 F.L.R.A. 1532, 1536 (1996).) Over a dissent, the Authority affirmed. We now consider the union's petition for review, mindful that "the Authority's decision may only be set aside if it is . . . 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ass'n of Civilian Technicians, Tex. Lone Star Chapter 100 v. FLRA*, 250 F.3d 778, 782 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A) (2000)).

## II.

The union first argues that its failure to request bargaining within ten days of receiving the 1997 handwritten note did not amount to a waiver of its bargaining rights because it submitted the child-care issue to the Labor–Management Partnership Council. The union points out that the collective bargaining agreement nowhere requires the union to submit issues to the Council within ten days (or any other time period) and that the Council's by-laws provide that an issue

can be withdrawn from the Council if the parties are unable to resolve it through the Council process, at which point the issue "would revert to normal collective bargaining procedures." Pet'r's Br. at 22. Noting that neither side ever withdrew the SAS issue from the Council, the union asserts that it cannot be deemed to have waived the right to bargain over that issue.

The problem with this argument, as the Authority's rejection of it suggests, is that it ignores the collective bargaining agreement's ten-day limitations period. The agreement plainly states that if the union fails to request bargaining within ten days, "negotiations are waived on the specific change(s) or implementation." Nothing in the agreement indicates that submitting an issue to the Council tolls the ten-day period. Indeed, if by submitting an issue to the Council at any time the union could revive its right to bargain over that issue after failing to seek negotiations within ten days, then the ten-day period would be meaningless. The section of the collective bargaining agreement providing that issues withdrawn from the Council revert to normal collective bargaining procedures merely ensures that the union will not forfeit bargaining rights *that it has preserved.* In other words, if the union requests bargaining over an issue within the ten-day period, then a subsequent decision to submit that issue to the Council does not constitute a waiver of its bargaining rights. The collective bargaining agreement simply freezes the collective bargaining situation for as long as the parties attempt to address an issue in the Council. We thus reject the union's assertion that its submission of the child-care issue to the Council revived the bargaining rights that it waived by failing to request negotiations within ten days of receiving the handwritten note.

More meritorious is the union's alternative argument that the depot's 2001 notice gave the union a new ten-day window in which to request bargaining over the SAS closure. The Authority rejected this argument, noting that "neither the delay in closure nor the exploration of alternatives to closure could reasonably be construed as a recission of the [1997] decision to terminate the SAS program." *U.S. Dep't of the*

*Army, Letterkenny Army Depot*, 58 F.L.R.A. No. 166, 2003 WL 21690708, at *2 (July 14, 2003). Moreover, the Authority said, "[i]f delaying an adverse event for employees gave rise to new bargaining obligations by virtue of the passage of time, an employer would be deterred from attempting to reduce the impact of an adverse event through delayed implementation." *Id.*

We are unable to reconcile the Authority's reasoning with its own case law. Authority precedent provides that before unions have any obligation to request bargaining over proposed changes, they must receive adequate notice of the changes. *See, e.g.*, *U.S. Penitentiary, Leavenworth, Kan.*, 55 F.L.R.A. 704, 715 (1999) ("Adequate notice of a proposed change in conditions of employment triggers the exclusive representative's responsibility to request bargaining over the change."). To be adequate, "[n]otice . . . must be sufficiently specific and definitive to . . . provide the exclusive representative with a reasonable opportunity to request bargaining. For example, the notice must apprise the exclusive representative of the . . . planned timing of the change." *U.S. Army Corps of Eng'rs, Memphis Dist.*, 53 F.L.R.A. 79, 82 (1997) (citation omitted). Notices that omit the timing of a change are therefore inadequate. *See, e.g.*, *Ogden Air Logistics Ctr., Hill Air Force Base*, 41 F.L.R.A. 690, 698 (1991) (finding a notice inadequate because "it did not specify either the number of employees to be placed in a nonpay status or the expected date of the actions"); *U.S. Patent & Trademark Office*, 2001 WL 1035062, at **42, (FLRA May 24, 2001) ("PTO's . . . notice was not adequate as it did not state or otherwise indicate when hiring and/or implementation of the plan or payments of the recruitment bonuses would be offered or commenced."). We see no basis for reaching a different result where, as here, the timing of a change deviates significantly from what appears in a notice. Either way, the union lacks accurate information about the timing of the change as actually implemented and may therefore be unable to make an informed decision about whether to request bargaining over the change.

Although the Authority neither explained why it viewed this case differently than those in which notices omit timing

information nor even acknowledged its own case law requiring that notices provide such information, its short opinion did cite with evident approval the ALJ's statement that "there was nothing in the Union's January 2001 proposals that could not also have [been] submitted in April 1997, when it first learned of the SAS closure." *Letterkenny*, 2003 WL 21690708, at *2. That statement is incorrect. In 1999, *after* the union received the handwritten notice, Congress authorized federal agencies to use funds appropriated for salaries to lower the cost of employee child care. *See* Pub. L. No. 106–58, § 643(a), 113 Stat. 430, 477 (1999). Agencies could do this by, for example, providing tuition assistance to children attending private child-care facilities. *See* 5 C.F.R. § 792.218 (2004) ("The bill includes non-Federal center-based child care as well as care in family child care homes . . . ."). One of the five proposals the union submitted for bargaining in 2001 related to such tuition assistance. Indeed, the two sides were still negotiating over just this proposal when the depot withdrew from negotiations. The Authority's ruling thus rests on a factual inaccuracy, i.e., that "there was nothing in the Union's January 2001 proposals that could not also have [been] submitted in April 1997." In fact, as the union points out, the ruling required it to do the impossible: "to have presented its proposal on childcare tuition assistance *prior to* the time government-wide regulations authorized agencies to use appropriated funds for this purpose." Pet'r's Br. at 23.

The intervening change in law not only undermines the Authority's reasoning but also distinguishes this case from *Department of the Treasury, Internal Revenue Service*, 20 F.L.R.A. 403 (1985), on which the Authority relies. In *IRS*, the Authority held that a two-year delay in the implementation of a proposed change created no new bargaining obligation because "the nature and degree of the impact of the change in 1983 did not differ from the impact that was foreseeable when Respondent developed its plan in 1981." *Id.* at 406, *quoted in* Resp't's Br. at 22. But here, contrary to the Authority's contention, the new law did affect the impact of the SAS closure. Specifically, the law gave the depot a new way to mitigate the loss of child-care services, i.e.,

offering tuition assistance to employees who moved their children from the closed SAS facility into private child-care programs, and thus provided the union with a reason to request bargaining—a reason it lacked in 1997. *IRS* therefore provides no support for the Authority's decision.

The Authority also reasoned that a contrary ruling would encourage employers to implement changes sooner rather than later even if delayed implementation was possible and could benefit employees. An employer would do this, the Authority explained, because if it had previously notified the union about a proposed change and discharged any obligation it had to bargain over the change (either because the two sides finished bargaining or because the union waived its bargaining rights), then delaying implementation would force it to take on new bargaining obligations. This reasoning suffers from two defects.

First, and most important, it runs counter to Authority cases holding that notices are inadequate unless they include information about the planned timing of a proposed change. *See supra* pages 6–7. If employers can alter the timing of proposed changes long after providing notice, then the requirement that notices include timing information is weakened if not eliminated. To be sure, the Authority may depart from its precedent, but as we have explained, "[a]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Nat'l Rural Elec. Coop. Ass'n v. SEC*, 276 F.3d 609, 615 (D.C. Cir. 2002) (quoting *Greater Boston Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)) (internal quotation marks omitted). The Authority failed to do so in this case.

Second, the Authority overlooks that an employer having no further obligation to bargain over a change can inform the union that it will delay implementation of the change only in exchange for the union's agreement that the delay will give rise to no new bargaining obligations. A union may, of course, reject such an offer and instead wait to see whether the employer will delay implementation irrespective of the

union's willingness to waive new bargaining rights. The point is simply this: what the Authority calls "sound policy reasons" for its decision, Resp't's Br. at 21–22, are unpersuasive because a contrary decision would in fact not force employers to choose between taking on new bargaining obligations and implementing a proposed change sooner rather than later.

In sum, we conclude that the depot had an obligation to negotiate with the union over the 2001 closure of the SAS. Although the union waived its right to bargain over the "September 1998/March 1999" closure that the handwritten note announced, that waiver did not forfeit the union's right to bargain over a closure that occurred several years after the proposed time frame contained in the note.

### III.

Congress passed the Federal Labor Relations Act to encourage collective bargaining between federal employees and their employers. It did so after finding that such bargaining is "in the public interest" because, among other things, it "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a) (2000). While the Act imposes obligations as well as benefits on federal employees, obligations with which the Authority must ensure compliance, we believe the Authority's reasoning in this case reflects an inappropriate willingness to erect barriers to collective bargaining that are inconsistent with the text and purposes of the statute. Thwarting Congress's intent to promote collective bargaining, such barriers are not "in the public interest" because they hamper realization of the benefits that such bargaining produces.

The petition for review is granted and the case is remanded to the Authority for further proceedings consistent with this opinion.

*So ordered.*