# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 3, 2020         Decided June 9, 2020

No. 19-1069

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
AFL-CIO, LOCAL 1929,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

On Petition for Review of an Order of
the Federal Labor Relations Authority

*Matthew W. Milledge* argued the cause for petitioner. With him on the briefs were *David A. Borer* and *Andres M. Grajales*.

*Noah Peters*, Solicitor, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief was *Rebecca J. Osborne*, Deputy Solicitor.

Before: SRINIVASAN, *Chief Judge*, HENDERSON, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

2

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Federal Service Labor-Management Relations Statute (FSLMRS or Statute), 5 U.S.C. §§ 7101 *et seq.*, requires federal agencies to notify and negotiate with unions before changing federal employees' conditions of employment. The U.S. Customs and Border Protection (CBP) distributed a memorandum (Memo) to its agents changing vehicle inspection procedures at the El Paso border checkpoint. The American Federation of Government Employees, Local 1929, AFL-CIO (AFGE or Union) filed a grievance on behalf of the CBP agents claiming that the CBP failed to notify and negotiate with it before issuing the Memo. After an arbitrator found in favor of the AFGE, the Federal Labor Relations Authority (Authority) set aside the arbitrator's award, concluding that the Memo did not constitute a change over which the CBP must bargain. Because the Authority failed to reasonably explain its departure from precedent and its conclusion that the Memo was not subject to bargaining under the Statute, we grant the Union's petition, concluding that the Authority's order was arbitrary and capricious and remanding to the Authority for further proceedings consistent with this opinion.

## I.   BACKGROUND

The FSLMRS "requires a federal agency to negotiate in good faith with the chosen representative of employees covered by the Statute, 5 U.S.C. § 7114(a)(4), and makes it an unfair labor practice to refuse to do so, § 7116(a)(5)." *Fort Stewart Sch. v. FLRA*, 495 U.S. 641, 644 (1990). "The scope of the negotiating obligation is set forth in § 7102, which confers upon covered employees the right, through their chosen representative, 'to engage in collective bargaining with respect to conditions of employment.'" *Id.* (quoting 5 U.S.C. § 7102(2)). "It is well established that before changing conditions of employment, an agency must provide the union

with notice and an opportunity to bargain over those aspects of the change that are within the duty to bargain." *U.S. Dep't of Homeland Sec. U.S. Citizenship & Immigration Servs.*, 69 F.L.R.A. 512, 515 (2016).

The Statute defines "conditions of employment" as follows:

> "conditions of employment" means personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters—
> (A) relating to political activities prohibited under subchapter III of chapter 73 of this title;
> (B) relating to the classification of any position; or
> (C) to the extent such matters are specifically provided for by Federal statute.

5 U.S.C. § 7103(a)(14).

The employing agency in this case is the CBP. The employees are CBP agents who conduct vehicle inspections at border checkpoints in the El Paso, Texas sector. The agents' primary responsibility at the checkpoints is to inspect vehicles entering the United States. The checkpoint is divided into two areas—the primary inspection area and the secondary inspection area. The primary area consists of lanes in which vehicles first enter, stop and are inspected. In this area, agents inspect the vehicle, scan the license plate number and examine the occupants' identifying documents. The secondary area is designed for additional inspection. Agents in the primary area have discretion to send a vehicle to the secondary area for a

more thorough inspection—where information like license plate numbers and identifying document data can be run through various databases. The main distinction between the two areas is the duration of the stop and the singling out of a vehicle for additional inspection.

In 2014, the CBP division chief for the El Paso sector discovered that some agents in the primary area were failing to detect fraudulent documents. To address this lapse, the division chief distributed a memorandum to agents entitled "El Paso Sector Checkpoint Operations." Joint Appendix (JA) at 1. The Memo directed agents to (1) "send vehicles with more than one occupant when at least one of the occupants is a non U.S. citizen who present[s] some form of immigration document, to the secondary inspection area for a more thorough immigration inspection, interview, document review, and if needed to conduct a records check" and to (2) "request a second form of identification from non U.S. citizens in order to further confirm the identity of the presenter." *Id.* The Memo allowed agents to modify the Memo's instructions at their discretion in order to accommodate "local residents, daily commuters, and other trusted travelers who regularly pass through" or when "safety to the public and/or our agents may be an issue, i.e. traffic is backed up, weather related issues, etc." *Id.*

In response to the Memo, the AFGE filed a grievance on behalf of the agents alleging that the CBP violated the Statute by changing a condition of employment without notifying and negotiating with the Union. The CBP denied the grievance and the parties submitted the matter to arbitration. The arbitrator agreed with the AFGE, concluding that the CBP had changed a condition of employment by issuing the Memo and thus violated the Statute by failing to first notify and negotiate with the Union. Specifically, the arbitrator found that the

5

Memo changed the agents' duties by lessening the primary area agents' discretion to decide who to send to the secondary area, requiring them to determine when the secondary lane was too backed up, increasing the vehicular traffic in the secondary area and potentially requiring them to input more data for referred vehicles into their databases. The arbitrator also found that the Memo raised reasonable safety concerns for secondary area agents who must manage an increase in traffic, persons and inspections.

The CBP filed exceptions to the arbitration award with the Authority. The Authority issued an order setting aside the award. *U.S. Dep't of Homeland Sec. U.S. Customs & Border Prot. El Paso, Tex.*, 70 F.L.R.A. 501 (2018) (*El Paso I*). First, the Authority took "the opportunity" to correct its "erroneous" precedent by "clarify[ing] that there is a distinction between" the terms "conditions of employment" and "working conditions" in the Statute. *Id.* at 501, 503. Second, the Authority concluded that the Memo did not constitute a change that must be bargained over for three reasons: (1) its past decisions had "held that mere increases or decreases in normal duties do not constitute changes over which an agency must bargain," (2) the Memo "did not change the *nature of* or the *type of* duties the officers performed," and (3) "the directions contained in the [Memo] did not change anything and they did not impact a condition of employment." *Id.* at 503–04.

The Union moved for reconsideration. The Authority denied the motion, relying largely on the reasons supporting its original order. *U.S. Dep't of Homeland Sec. U.S. Customs &*

*Border Prot. El Paso, Tex.*, 71 F.L.R.A. 49 (2019) (*El Paso II*). The AFGE now petitions for review of the Authority's orders.[1]

## II.  ANALYSIS

We have jurisdiction of the AFGE's petition for review under 5 U.S.C. § 7123(a).  "The Authority must 'provide a rational explanation for its decision' but in reviewing unfair labor practice determinations, the court 'recogniz[es] that such determinations are best left to the expert judgment of the [Authority].'"  *Nat'l Treasury Emps. Union v. FLRA*, 745 F.3d 1219, 1224 (D.C. Cir. 2014) (alterations in original).

We "will set aside an order of the Authority only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id.* at 1223 (quoting 5 U.S.C. § 706(2)(A)); *see also* 5 U.S.C. § 7123(c) ("Review of the Authority's order shall be on the record in accordance with section 706 of this title.").  Under the arbitrary and capricious standard of review, we must ensure that the Authority "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (alterations in original) (citation omitted).  Put differently, to survive arbitrary and capricious review, the Authority must show that it engaged in "reasoned decisionmaking," *id.* (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)), and that its decision was "reasonable and reasonably explained," *Cytori Therapeutics, Inc. v. FDA*, 715

---

[1]  In the proceedings before the arbitrator and the Authority, the AFGE also challenged the Memo as violating the parties' collective bargaining agreement but, on appeal, does not challenge the Authority's order with respect to the collective bargaining agreement.

F.3d 922, 926 (D.C. Cir. 2013). Finally, although "the Authority may depart from its precedent," we have explained that "[a]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Nat'l Fed'n of Fed. Emps. v. FLRA*, 369 F.3d 548, 553 (D.C. Cir. 2004) (alteration in original) (citation omitted); *see also FedEx Home Delivery v. NLRB*, 849 F.3d 1123, 1127 (D.C. Cir. 2017) ("[O]n matters to which courts accord administrative deference, agencies may change their interpretation and implementation of the law if doing so is reasonable, within the scope of the statutory delegation, and the departure from past precedent is sensibly explained." (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001–02 (2005))).

Here, the Authority's *El Paso I* order failed to reasonably explain its departure from precedent and its decision denying the AFGE's bargaining request. Specifically, it failed to explain how its decision comports with the express language of 5 U.S.C. § 7103(a)(14). The Authority characterizes its decision as clarifying the terms of the Statute but its rationale provides more questions than answers. Its order, then, is arbitrary and capricious.

### A. THE STATUTE AND AUTHORITY PRECEDENT

We begin with the Statute itself. "Conditions," on its own, is subject to "two common meanings"—(1) "matters 'established or agreed upon as a requisite to the doing . . . of something else'"; or (2) "'attendant circumstances,' or an 'existing state of affairs.'" *Fort Stewart*, 495 U.S. at 645 (citation omitted). Thus, "conditions," as used in the statutory phrases "conditions of employment" and "working conditions," is ambiguous. *See id.* But unlike the phrase

"working conditions," which is undefined by the Statute, "conditions of employment" is expressly defined in § 7103(a)(14) as "personnel policies, practices, and matters, whether established by rule or otherwise, affecting working conditions." Therefore, no matter what ambiguity exists in "conditions" generally, the Statute's definition of "conditions of employment" requires an agency to bargain over changes in personnel policies, practices and matters that affect working conditions.

For that reason, the Authority's claim in *El Paso I* that "the issuance of a memorandum which affects working conditions, but not conditions of employment, does not constitute a change over which CBP must bargain," *El Paso I*, 70 FLRA at 501, would appear, at first blush, to contradict the Statute. If the relevant inquiry under § 7103(a)(14) is whether an agency's action constitutes a change in "personnel policies, practices, and matters . . . affecting working conditions," it would seem that a memo that affects working conditions is, by definition, a condition of employment over which the agency must bargain. The only way this would not be accurate is if the memo is not a *personnel policy, practice or matter*. The Authority understands this point on appeal. *See* Resp. Br. at 21 ("The more natural reading of term 'conditions of employment' is that an agency is not obligated to bargain over 'working conditions' as such, but only a more limited subset of 'personnel policies, practices, and matters . . . that 'affect[] working conditions'" (alteration in original) (quoting § 7103(a)(14)). But that understanding and explanation are wholly lacking in *El Paso I*, where it counts. *See Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 734 (D.C. Cir. 2019) ("[C]ourts may not accept appellate counsel's *post hoc* rationalization for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." (quoting

*Erie Brush & Mfg. Corp. v. NLRB*, 700 F.3d 17, 23 (D.C. Cir. 2012)) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))).

Instead, in *El Paso I*, the Authority took "the opportunity" to alter its precedent "to clarify that there is a distinction between" conditions of employment and working conditions but failed to explain its departure from precedent. *El Paso I*, 70 F.L.R.A. at 501, 503. Before *El Paso I*, the Authority defined "working conditions" in § 7103(a)(14) broadly, maintaining that "there is no substantive difference between [the terms] 'conditions of employment' and 'working conditions' as those terms are practically applied." *U.S. Dep't of the Air Force 355th MSG/CC Davis-Monthan Air Force Base*, 64 F.L.R.A. 85, 90 (2009); *see also U.S. Dep't of Homeland Sec. v. FLRA*, 647 F.3d 359, 365 (D.C. Cir. 2011) ("[B]oth courts and the Authority have accorded [working conditions] a broad interpretation that encapsulates a wide range of subjects that is effectively synonymous with conditions of employment." (second alteration in original) (citation and internal quotation marks omitted)).[2] In *El Paso I*, the Authority concluded that its earlier view was "erroneous" because it violated the "canon of statutory interpretation that 'Congress acts intentionally' when it 'inclu[des] or exclu[des]'

---

[2] We have upheld the Authority's earlier interpretation of conditions of employment and working conditions as reasonable. *See U.S. Dep't of Homeland Sec.*, 647 F.3d at 364–65. But that holding does not necessarily prevent the Authority from changing its interpretation so long as the change is within the Authority's discretion and is reasonably explained. *See Brand X*, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."); *FedEx Home Delivery*, 849 F.3d at 1127.

particular words in a statute" and amounted to "circular reasoning." 70 F.L.R.A. at 503 (alterations in original). The Authority then concluded that "[i]t is . . . imperative that we respect that distinction and define the differences for the labor-management relationships community." *Id.*

Beyond stating that "[t]he terms are related, but they are not synonymous," *id.*, however, the Authority fails to explain the differences between the terms or how the alleged differences matter under the language of § 7103(a)(14). First, the Authority has misread United States Supreme Court precedent. It quotes the High Court's *Fort Stewart* decision for the proposition that "while the term 'conditions of employment' is susceptible to multiple interpretations, the term 'working conditions,' as used in § 7103(a)(14), 'more naturally refers . . . only to the "circumstances" or "state of affairs" attendant to one's performance of a job.'" *Id.* (quoting *Fort Stewart*, 495 U.S. at 645). But the Supreme Court, in deciding whether an employer was required to bargain over wages and benefits in *Fort Stewart*, explained that "working conditions" in § 7103(a)(14) "more naturally refers, *in isolation*, only to the 'circumstances' or 'state of affairs' attendant" to one's job performance. 495 U.S. at 645 (emphasis added) (citation omitted). But the Court clarified that "here it is not in isolation, but forms part of a paragraph whose structure, as a whole, lends support to the Authority's broader reading." *Id.* at 646. By omitting the phrase "in isolation" and the High Court's subsequent clarification, the Authority misreads *Fort Stewart* to imply that "working conditions" has a free-standing definition when, in fact, the point being made in *Fort Stewart* is the opposite.

Second, the Authority fails to explain how its definition of "working conditions" differs from the statutory definition of "conditions of employment." It concludes the terms are *not*

synonymous but then defines working conditions based on a misreading of *Fort Stewart*. It goes no further, leaving a gap in its reasoning. It does not explain how to tell the difference between what constitutes a condition of employment versus a working condition. More importantly, it does not explain how its revised interpretation substantively changes what aspects of employment are bargainable under § 7103(a)(14).

On appeal, the Authority argues that it did explain the difference by relying on concurrences of former FLRA Chairman Dale Cabaniss in earlier cases. But the Authority cites those concurrences only to support the proposition that conditions of employment and working conditions are not synonymous, *see* 70 F.L.R.A. at 503 n.33; it does not elaborate on Cabaniss's view of the distinction between the terms. And if we look to Cabaniss's explanation of how conditions of employment and working conditions are different, that explanation does not help the Authority on the facts of this case. In the cited concurrences, Cabaniss articulated the distinction between the two terms:

> As reflected in our Statute, "conditions of employment" is a term of art expressly defined at § 7103(a)(14) that means "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, *affecting working conditions*." Clearly, "conditions of employment" and "working conditions" are related, but they are not the same thing. For example, "working conditions" would be an employee's work starting and stopping times, or whether the employee has the ability to take home a government owned vehicle (GOV): "conditions of employment" would be the "rules, regulations, or otherwise" that define the

> hours of work for the bargaining unit, or determine whether or what employees have the right to take that GOV home.

*U.S. Dep't of Veterans Affairs Med. Ctr. Sheridan, Wyo.*, 59 F.L.R.A. 93, 95 (2003) (Cabaniss, Chairman, concurring).[3] Under this reasoning, a memo setting forth procedures for where and how agents conduct inspections would seem to meet Cabaniss's definition of conditions of employment. In other words, had the Authority in *El Paso I* used Cabaniss's formulation to explain the distinction between working conditions and conditions of employment under the Statute, it still would not provide sufficient support for the Authority's conclusion—without further explanation—that the CBP was not required to bargain over the Memo.

In sum, the Authority departed from precedent based on a misreading of case law and without explaining the departure. Such a change is not "sensibly explained." *FedEx Home Delivery*, 849 F.3d at 1127.

## B. THE MEMO

The Authority also fails to explain its determination that the Memo is not a change over which the CBP must bargain. First, the Authority turns to precedent concluding that an agency need not bargain over "mere increases or decreases in normal duties." *El Paso I*, 70 F.L.R.A. at 503 (citing *Nat'l Treasury Emps. Union* (*NTEU*), 66 F.L.R.A. 577, 579 (2012)). But the Authority fails to mention that *NTEU* applies only if the increase or decrease is "not attributable to any change in the agency's policies, practices, or procedures affecting working

---

[3] *See also U.S. Dep't of Labor Occup. Safety & Health Admin. Region 1 Bos., Mass.*, 58 F.L.R.A. 213, 216 (2002) (Cabaniss, Chairman, concurring) (same).

conditions." *NTEU*, 66 F.L.R.A. at 579. Increases or decreases "'[s]tanding alone' do not trigger notice-and-bargaining obligations." *Id.* (alteration in original) (citation omitted). Granted, in a case involving changes in the location of the processing of immigrants in response to an unusual influx of immigration at the U.S. border, the Authority determined that "[e]ven if we were to consider that increase to be attributable to the Respondent, we would find, based on our precedent, that dismissal of the complaint is warranted because there was no change in unit employees' conditions of employment." *U.S. Dep't of Homeland Sec. Border & Transp. Sec. Directorate U.S. Customs & Border Prot. Border Patrol, Tucson Sector Tucson, Az.* (*CBP Tucson*), 60 F.L.R.A. 169, 174 (2004). But in that decision the Authority went on to say that "nothing in the record establishes that the Respondent changed the 'type' of aliens that were being processed, the type of work that bargaining unit employees performed or, *in any manner, the processing of alien apprehensions*." *Id.* (emphasis added). Here, on the other hand, to the extent the duties of the secondary area agents increased, that increase was caused by the change in procedure dictated by the Memo. Moreover, unlike *CBP Tucson*, the Memo changed the inspection procedure in the primary and secondary areas—as noted earlier, agents were required to conduct inspections in the primary and secondary areas in ways different from those used before the Memo's issuance.[4]

---

[4] On appeal, the Authority also relies on *U.S. Dep't of the Air Force, Headquarters, 96th Air Base Wing, Eglin Air Force Base, Fla.* (*Eglin*), 58 F.L.R.A. 626 (2003), where the Authority concluded that an instruction letter changing crew chief assignments at a U.S. Air Force base did not change any established practice (and thus the conditions of employment) because it found the agency had an established practice of modifying work assignments based on mission and workflow fluctuations. *Id.* at 630; *see also CBP Tucson*, 60 F.L.R.A. at 174 (citing *Eglin*, 58 F.L.R.A. at 626).

14

Second, the Authority maintains that the Memo "did not change the *nature of* or the *type of* duties the officers performed." *El Paso I*, 70 F.L.R.A. at 503. Relying on 5 U.S.C. § 7106(a)(2)(A), (B), the Authority noted that supervisors have the responsibility and prerogative to direct how employees perform their jobs, concluding that "[a] supervisor does not have to negotiate with the union every time she adjusts or alters how employees will perform their duties." *Id.* What is missing from this analysis is any connection to the definition of conditions of employment in § 7103(a)(14). In other words, the Authority does not explain how the nature of or type of duties performed is relevant under the statutory definition of conditions of employment.[5] After spending the bulk of its discussion emphasizing the importance of distinguishing conditions of employment from working conditions, the Authority fails to tie its analysis back to those terms under the Statute. Moreover, although the Authority cites 5 U.S.C. § 7106(a)(2)(A), (B) for the proposition that "management has the right to 'direct . . . employees,' 'assign work,' and 'determine the personnel by which agency operations shall be conducted,'" *El Paso I*, 70 F.L.R.A. at 503 n.38 (quoting § 7106(a)(2)(A), (B)), the very next subsection

Unlike *Eglin*, where the agency changed the aircraft that engineers were assigned to work on, the Memo changed *how* agents conduct border inspections—*i.e.* their *practice*—in the primary and secondary areas, including how and where agents direct certain vehicles. Assuming arguendo the changes do *not* constitute changes in personnel policies, practices or matters that affect agents' working conditions, *El Paso I* fails to explain why they do not.

[5] And to the extent that the Authority relies on *CBP Tucson* for this proposition, *see El Paso II*, 71 F.L.R.A. at 51, as explained above, that case is distinguishable and the Authority fails to explain how the Memo in this case does not change "in any manner" the inspection procedures performed at border checkpoints. *See CBP Tucson*, 60 F.L.R.A. at 174.

says that "[n]othing in this section shall preclude any agency and any labor organization from negotiating . . . procedures which management officials of the agency will observe in exercising any authority under this section," § 7106(b)(2). The Memo in this case arguably goes beyond merely assigning work in that it changes the inspection procedures at border checkpoints, at least slightly, but to the extent it does involve assigning work and determining personnel, it would constitute the procedure which CBP management observe in making those decisions. As such, neither § 7106(a)(2)(A) or (B) appear to help the Authority here.

Third, the Authority concludes that "the directions contained in the memorandum did not change anything and they did not impact a condition of employment." *El Paso I*, 70 F.L.R.A. at 504. But the Memo plainly changed *something*. What the Authority must make clear—and has not—is whether the change was a change in a personnel policy, practice or matter that affected working conditions. On its face, the Memo changes how and where certain inspections are performed at border checkpoints, which results in different instructions for agents in the primary area, more cars in the secondary area and the potential of increased risk to secondary area agents. The Authority fails to explain why these changes do not constitute a change in conditions of employment under § 7103(a)(14).

\* \* \*

Agencies reading *El Paso I* are left wondering how the Authority reached its decision that the CBP was free to issue the Memo without bargaining in light of § 7103(a)(14)'s language and so are we. Was it because the Memo did not affect working conditions? Was it because the Memo was not a personnel policy, practice or matter? Was it because of

some other rule or exception?   An agency decision that fails to answer such basic questions is not the product of "reasoned decisionmaking."   *See Tramont Mfg., LLC v. NLRB*, 890 F.3d 1114, 1119 (D.C. Cir. 2018).   Nor does it "sensibly explain[]" a departure from contrary precedent.   *See FedEx Home Delivery.*, 849 F.3d at 1127.

For the foregoing reasons, we grant the AFGE's petition for review, vacate *El Paso I* and remand to the Authority for further proceedings consistent with this opinion.[6]

*So ordered.*

---

[6]   The AFGE's petition for review of the denial of reconsideration in *El Paso II* is dismissed as moot.