# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 14, 2021　　　Decided January 28, 2022

No. 20-1398

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
AFL-CIO,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

———

Consolidated with 20-1399, 20-1405

———

On Petitions for Review of a Decision
of the Federal Labor Relations Authority

———

*Paras N. Shah* argued the cause for petitioners. With him on the briefs were *Gregory O'Duden, Julie M. Wilson, David A. Borer, Andres M. Grajales, Chad E. Harris, Judith E. Rivlin,* and *Teague P. Paterson.*

*Noah Peters*, Solicitor, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief were *Rebecca J. Osborne*, Deputy Solicitor, and *Sarah C. Blackadar*, Attorney.

Before: SRINIVASAN, *Chief Judge*, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  When issues arise during the term of a collective bargaining agreement that are not covered by the agreement, federal employees may seek to bargain with their agency employers over how such issues should be handled.  For its part, an agency may try to head off such midterm bargaining by securing during term bargaining a clause in the parties' collective bargaining agreement that limits or forecloses midterm bargaining.  Such a clause is commonly referred to as a zipper clause—a clause that treats the term agreement as having zipped up, or closed off, potential midterm bargaining.  Unions, valuing the opportunity to negotiate midterm on unforeseen matters not already covered by the existing agreement, such as the effect of a pandemic on the workplace, generally oppose zipper clauses.

It is not disputed that parties may negotiate over and agree to a zipper clause.  But what happens if an agency proposes a zipper clause, and the union disagrees on whether or to what extent to include it in the collective bargaining agreement?  The answer largely depends on whether zipper clauses are a "mandatory" or "permissive" subject of bargaining.  Federal labor law treats some subjects of collective bargaining as mandatory, meaning that when parties bargain to impasse over proposals on those subjects, a dissatisfied party may seek resolution from the Federal Service Impasses Panel.  And Panel resolution may include imposition of the clause in the agreement over the other party's objection.  In contrast, subjects that are permissive for one or both parties are those on which a party may choose to, but need not, bargain.  A party may decline to negotiate on proposals on permissive subjects,

and its counterparty may not take disputes over such proposals to the impasses panel for potential insertion into the agreement.

The unions here challenge a Policy Statement of the Federal Labor Relations Authority that announced for the first time that zipper clauses are mandatory bargaining subjects. *U.S. Off. of Pers. Mgmt. (Petitioner)* (*Policy Statement*), 71 F.L.R.A. 977, 977 (Sept. 30, 2020). In other words, the Authority determined that, if an agency and a union intractably disagree over a zipper clause proposal, the agency may bring the proposal to the impasses panel—which has the authority to put it (or a different clause reflecting what it determines to be a better resolution) into the parties' term agreement. FLRA policy statements are unusual: Before producing a spate of them in 2020, including the one challenged here, the Authority had not issued any Policy Statement in over thirty-five years. Three labor unions challenge this one as arbitrary and capricious.

We grant the petitions for review and vacate the Policy Statement. Importantly for our analysis, the Authority chose to structure its consideration of the zipper clause question in two steps, casting its answer at step one as also determinative of step two. The Authority first held that the Federal Service Labor-Management Relations Statute (Statute) does not entitle employees to demand midterm bargaining even when the parties' agreement is silent on the matter. *Policy Statement*, 71 F.L.R.A. at 979. The Authority then relied on that holding as "necessary" to its conclusion that proposed contractual zipper clauses expressly foreclosing midterm bargaining are mandatory bargaining subjects. *Id.* at 979 n.35. The first holding was arbitrary and capricious. The Authority's errors include miscasting Supreme Court precedent, relying on conclusory assertions, and mischaracterizing its dramatic shift of the bargaining baseline as allowing "the parties to resolve"

the issue. *Id.* at 979. And, because the Authority avowedly rested its second holding on its first, we must vacate the zipper clause holding as well. In view of these conclusions, we need not rule on the unions' threshold objection that the Authority ignored its own criteria for issuance of general statements of policy. *See* 5 C.F.R. § 2427.5.

## I. BACKGROUND

In July 2019, the Office of Personnel Management (OPM) petitioned the Authority for a policy statement on the question whether zipper clauses are mandatory or permissive bargaining subjects. *See* 5 U.S.C. § 7105(a)(1) (statutory basis for FLRA policy statements); 5 C.F.R. §§ 2427.1-.5 (governing regulations). The Authority solicited comments on that question, and ten commenters timely responded.

Some commenters supportive of the proposed policy thought that zipper clauses must be mandatory because "all conditions of employment are presumed to be mandatory subjects of bargaining" unless the Statute "explicitly or by unambiguous implication" defines them as permissive, which they argued it does not. *See, e.g.*, U.S. Dep't of Agric., Comment Letter on Proposed General Statement of Policy (Apr. 29, 2020) (quoting *Nat'l Treasury Emps. Union v. FLRA* (*NTEU 2005*), 399 F.3d 334, 340 (D.C. Cir. 2005)), J.A. 67-68. Commenters reasoned that zipper clauses should be viewed as mandatory based on the Authority's mandatory characterization of reopener clauses, which expressly allow midterm bargaining that would otherwise be foreclosed as to subjects already "covered by" a term agreement. *See Nat'l Treasury Emps. Union & U.S. Customs Serv.*, 64 F.L.R.A. 156, 157-58 (2009). Agencies also commented that restricting midterm bargaining would promote efficiency by encouraging

parties to predict their needs during initial, term bargaining so prevent "piecemeal" negotiation.[1]

Opponents of the proposed policy argued that the Statute establishes a unilateral statutory right to bargain midterm, equal to the right to bargain at term. Noting that the Authority recognizes midterm bargaining over the impact and implementation of certain management-initiated changes as a unilateral right subject to waiver only on a permissive basis, commenters applied the same reasoning to midterm bargaining on other subjects. Comments distinguished zipper clauses from reopeners, pointing out that reopeners address already-bargained issues whereas zippers "alter[] the scope of the duty to bargain mid-term with respect to virtually all contract terms . . . not resolved by the agreement"—including those never negotiated or anticipated.[2] Empowering the impasses panel to impose zipper clauses and long duration provisions, commenters predicted, "would adversely affect and prolong term bargaining" because, "[w]ithout the ability to bargain midterm, a union would feel compelled to bargain over and address every possible scenario, no matter how unlikely, that might come up during the term of the agreement." Nat'l Treasury Emps. Union, Comment Letter on Proposed General Statement of Policy (Apr. 30, 2020), J.A. 47.

---

[1] U.S. Dep't of Veterans Affs., Comment Letter on Proposed General Statement of Policy (Apr. 29, 2020), J.A. 22; *see* U.S. Immigr. & Customs Enf't, Comment Letter on Proposed General Statement of Policy (Apr. 30, 2020), J.A. 57.

[2] Ass'n of Admin. L. Judges, Comment Letter on Proposed General Statement of Policy (Apr. 29, 2020) (quoting *NTEU 2005*, 399 F.3d at 343), J.A. 20; *see also* Nat'l Air Traffic Controllers Ass'n, Comment Letter on Proposed General Statement of Policy (Apr. 30, 2020), J.A. 37-38; Nat'l Treasury Emps. Union, Comment Letter on Proposed General Statement of Policy (Apr. 30, 2020), J.A. 45-50.

We have had few occasions to address the distinction between mandatory and permissive subjects of bargaining. In *American Federation of Government Employees v. FLRA* (*AFGE 1983*), 712 F.2d 640 (D.C. Cir. 1983), we held that matters relating to conditions of employment are presumptively mandatory bargaining subjects unless the Statute "explicitly or by unambiguous implication" provides a party with a "unilateral right[]" regarding the matter under consideration. *AFGE 1983*, 712 F.2d at 646 & n.27 (formatting modified). If the Statute clearly confers a right on a party, in other words, the party may refuse to bargain over proposals on that matter. Agencies, for instance, need not bargain over their right "to determine the mission, budget, organization, number of employees, and internal security practices of the agency." 5 U.S.C. § 7106(a)(1). And employees need not bargain over their right "to engage in collective bargaining with respect to conditions of employment." 5 U.S.C. § 7102. But a party must bargain in good faith over any lawful proposal that does not trench on its unilateral rights.

We reaffirmed and elaborated that standard in *National Treasury Employees Union v. FLRA* (*NTEU 2005*), 399 F.3d 334 (D.C. Cir. 2005). We explained that not all rights provided by the Statute are necessarily unilateral rights and so permissive subjects of bargaining: Only rights which the Statute "explicitly or by unambiguous implication vests in a party" rise to the level of unilateral rights over which a party may but need not negotiate. *NTEU 2005*, 399 F.3d at 340 (quoting *AFGE 1983*, 712 F.2d at 646 n.27).

As OPM recognized in its request for the Policy Statement, whether zipper clauses are mandatory or permissive bargaining subjects was an open question. No court had squarely decided whether unions have a unilateral right to bargain midterm, nor had the Authority. The Authority expressly declined to decide

the point in *U.S. Department of the Interior, Washington, D.C.* (*Interior*), 56 F.L.R.A. 45 (2000), on remand from the Supreme Court.

The Supreme Court had held in *National Federation of Federal Employees, Local 1309 v. Interior* (*Local 1309*), 526 U.S. 86 (1999), that the Statute's text is ambiguous as to whether it confers a general right to midterm as well as term bargaining. *Local 1309*, 526 U.S. at 92. The key provision simply requires that parties "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement." *Id.* at 88 (quoting 5 U.S.C. § 7114(a)(4)). As the Court noted, "[o]ne can easily read 'arriving at *a collective bargaining agreement*' as including an agreement reached at the conclusion of *midterm* bargaining" just as it includes one resulting from *term* bargaining. *Id.* at 93 (second emphasis added). The Court acknowledged agencies' concerns that midterm bargaining could incentivize piecemeal negotiation, but also recognized policy reasons that the Statute might require midterm bargaining: "Without midterm bargaining," the Court wondered, "will it prove possible to find a collective solution to a workplace problem, say, a health or safety hazard, that first appeared midterm?" *Id.* at 94. Indeed, the Court reasoned, "[t]he Statute's emphasis upon collective bargaining as 'contribut[ing] to the effective conduct of public business' suggests that it would favor joint, not unilateral, solutions to such midterm problems." *Id.* (second alteration in original) (quoting 5 U.S.C. § 7101(a)(1)(B)). The Court accordingly remanded for the Authority, informed by its "expertise in its field of labor relations," to decide whether the Statute requires midterm bargaining. *Id.* at 99 (quoting *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983)).

The Authority took up that question in *Interior* and held that "under the Statute, agencies are obligated to bargain during

the term of a collective bargaining agreement on negotiable union proposals concerning matters that are not 'contained in or covered by' the term agreement, unless the union has waived its right." *Interior*, 56 F.L.R.A. at 54. Quoting Congress's statutory findings supportive of public-sector collective bargaining, the Authority underscored that nothing in the Statute suggests those findings are any less applicable to midterm than term bargaining. *Id.* at 51 (quoting 5 U.S.C. § 7101(a)(1)). The Authority's own judgment, informed by its experience, was that midterm bargaining leads to "more focused negotiations," neither prompting kitchen-sink term bargaining over issues that might never arise, nor delaying resolution of important concerns that arise midterm until term negotiations recommence. *Id.* at 52. The Authority rejected as "unsupported and speculative" arguments that union-initiated midterm bargaining was harmful to federal sector labor relations. *Id.* at 54. In its experience, midterm bargaining was appropriately limited by the doctrine barring renegotiation of matters covered by the term agreement, gave rise to few disputed cases, and had not led to piecemeal or "continuous" bargaining as critics feared. *Id.* at 53.

But *Interior* decided only the default rule that parties have a "statutory right" to bargain midterm if the contract is otherwise silent. The Authority disclaimed any view on whether proposals for contractual zipper clauses are mandatory or permissive bargaining subjects. *See Interior*, 56 F.L.R.A. at 54 ("[W]e will not consider" here the question "whether 'zipper clauses' are a mandatory subject of negotiation."). In deciding that the Statute requires midterm bargaining, then, *Interior* left open whether it does so "by unambiguous implication" so confers a "unilateral right" of the sort *AFGE 1983* and *NTEU 2005* described. That state of affairs prevailed for two decades.

The Authority in November 2019 rejected a request to revisit *Interior*, describing the case as its "seminal" precedent recognizing the statutory right to midterm bargaining. *See OPM*, 71 F.L.R.A. 423, 423 (2019). But just ten months later, in the Policy Statement before us, the Authority reversed course. Before addressing the question expressly left open by *Interior*, the Authority circled back to repudiate the core holding of *Interior* that it had reaffirmed just months earlier. Deeming reconsideration of that issue "necessary" to its decision of the question OPM presented—whether zipper clauses are mandatory or permissive—the Authority revisited *Interior*'s holding that the Statute requires midterm bargaining at all, even as a default rule. *See Policy Statement*, 71 F.L.R.A. at 979 n.35.

In a paragraph, the Authority jettisoned *Interior*. Contrary to its reasoning in *Interior*, the Authority's Policy Statement deemed it "more appropriate" to conclude that the Statute does not require midterm bargaining. *See Policy Statement*, 71 F.L.R.A. at 979. The Authority declared that the Statute "clearly established" an obligation to bargain at term, but it saw "indeterminacy in the Statute's text" as to whether it requires midterm bargaining. *Id.* The entirety of its analysis of the distinction it drew is terse:

> As previously mentioned, the Supreme Court [in *Local 1309*] held that the Statute does not clearly require or prohibit midterm bargaining. In its decision on remand from the Supreme Court, the Authority decided that the Statute requires midterm bargaining. However, the Authority's first consideration to support that conclusion is flawed. In particular, the Authority found that the Statute does not distinguish between obligations for midterm and term bargaining. But in one important respect, those obligations are

distinguishable: The parties' mutual obligation to bargain in term negotiations is clearly established in the Statute, whereas a mutual obligation to bargain midterm is not. Indeed, that indeterminacy in the Statute's text was the driving force behind the Supreme Court's ruling. Although the Court recognized that the Authority could resolve that ambiguity, and the Authority did so, we find it more appropriate to recognize that the Statute neither requires nor prohibits midterm bargaining. Instead, the Statute leaves midterm-bargaining obligations to the parties to resolve as part of their term negotiations.

*Id.* (footnotes omitted).

Having erased *Interior* by holding that the Statute simply does not obligate agencies to bargain midterm, the Authority then addressed the question OPM had posed: whether zipper clauses are mandatory or permissive bargaining subjects. Basing its conclusion on its reversal of *Interior*, the Authority held that zipper clauses are mandatory bargaining subjects. Immediately after the above-quoted paragraph regarding *Interior*, the Authority dispatched the zipper clause issue as follows:

Thus, we now hold that proposals that concern midterm-bargaining obligations—whether they resemble reopener or zipper clauses, or take some other form—are mandatory subjects of bargaining under the Statute.

That treatment is consistent with the Authority's previous recognition that matters relating to the parties' midterm-bargaining relationship plainly relate to conditions of employment. Further, the Statute presumes that all matters relating to conditions

of employment are mandatory subjects of bargaining unless the text explicitly or by unambiguous implication vests in a party an unqualified, or "unilateral," right. As explained above, the Statute does not, on its own, explicitly or by unambiguous implication vest either party with a unilateral right to engage in midterm bargaining. In other words, because neither party would be required to waive a statutory right, any proposal concerning midterm bargaining would come within the default rule that all matters relating to conditions of employment are mandatory subjects of bargaining.

*Policy Statement*, 71 F.L.R.A. at 979-80 (footnotes omitted).

The core of the Authority's reasoning is that, "[a]s explained above" in the prior paragraph regarding *Interior*, the Statute does not require midterm bargaining at all, even as a default matter, so necessarily fails to establish any unilateral right to midterm bargaining that would make it permissive, not mandatory, for unions to negotiate whether to retain that right to bargain. *Id.* at 980. The Authority held that the Statute consequently treats zipper clauses as mandatory bargaining subjects that, upon impasse, may be imposed on unions against their will by action of the impasses panel. In a footnote, the Authority added that it was "necessary" to decide whether the Statute requires midterm bargaining "in order to properly evaluate" the zipper clause question. *Id.* at 979 n.35. The Authority also asserted that other statutory language, which allows parties to determine appropriate techniques to aid their negotiations, offered "further support" for its position. *Id.* at 980.

Three federal employee labor unions timely petitioned for review, and we consolidated those cases. The unions contend

that the Authority violated its regulations providing criteria for issuance of Policy Statements, abrogated its precedent without reasoned explanation and in contravention of the Statute's text and purpose, and relied on unreasoned bases for concluding that zipper clauses are mandatory subjects of bargaining. We have jurisdiction, 5 U.S.C. § 7123(a), and the unions have standing, *see AFGE v. FLRA*, 750 F.2d 143, 144-45 (D.C. Cir. 1984).

## II. ANALYSIS

We evaluate the Authority's Policy Statement under the arbitrary and capricious standard of review. 5 U.S.C. § 7123(c); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34 (1983). Under that standard, "we must ensure that the Authority examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *AFGE v. FLRA* (*AFGE 2020*), 961 F.3d 452, 456 (D.C. Cir. 2020) (formatting modified). Put another way, the Authority must show that its decision "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52; *accord AFGE 2020*, 961 F.3d at 456-57 (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).

We "must judge the propriety of [an agency's] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196 (1947). "[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). We may limit invalidation to defective portions of an agency's action and leave others standing when "they operate entirely independently of one another," *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997), but will

invalidate the action as a whole if we are not "sure" the provisions are "wholly independent," *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017).

We begin where the Authority did, with its holding that the Statute does not require midterm bargaining. We vacate that holding as arbitrary and capricious. We then consider the Agency's ultimate holding that zipper clauses are mandatory bargaining subjects. Because the Authority treated its first, invalid holding as the "necessary" predicate to its second, we must vacate the latter as well.

## A. The Authority's First Holding Was Arbitrary and Capricious.

The Authority failed to offer a reasoned explanation for its decision that the Statute does not require midterm bargaining. The Policy Statement simply deemed it "more appropriate" to read the Statute to not require midterm bargaining. *Policy Statement*, 71 F.L.R.A. at 979. But it offered no non-arbitrary reason why.

The only explanation the Authority offered was what it saw as a negative implication of the statutory text: The Statute "clearly established" term bargaining but was "indetermina[te]" as to midterm bargaining, it reasoned, implying the exclusion of the latter. *Id.* But the statutory text does not separately define term and midterm bargaining. The text the Authority leans on as showing the "one important respect" in which the Statute differentiates the two bargaining stages, *id.*, in fact makes no distinction at all. It says only that the parties must "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement"— whether in term or midterm negotiations. 5 U.S.C. § 7114(a)(4).

Indeed, the Supreme Court in *Local 1309* held that the very phrase on which the Authority here relies does not differentiate the two bargaining stages, so that text cannot alone impart the meaning the Policy Statement ascribes to it. The Court stressed that the operative provision simply refers to collective bargaining, and that "[o]ne can easily read 'arriving at *a collective bargaining agreement*' as including an agreement reached at the conclusion of midterm bargaining." 526 U.S. at 93 (quoting 5 U.S.C. § 7114(a)(4)); *see also Policy Statement*, 71 F.L.R.A. at 983 (Member DuBester, dissenting) (observing that "*Local 1309* rejected this very premise" that the Policy Statement relies on). In fact, as discussed above, the Court suggested that the Statute's text, structure, history, and objectives taken together might imply a duty to bargain midterm as well as at term, *see* 526 U.S. at 94—perhaps even by unambiguous implication, *see Interior*, 56 F.L.R.A. at 54 (leaving the point open). As manifest by the Court's remand, the textual ambiguity of the identified phrase does not itself mean that midterm bargaining is *not* required.

The Authority's contrary view cannot stand. Its parsing of the same few words that the Court considered in *Local 1309* was the only reason the Authority gave for the first analytic step of its Policy Statement. In the absence of any other support, that first conclusion is arbitrary and capricious.

That flaw alone requires vacatur. But the Authority's holding was unreasoned in three further ways.

*First*, the Authority rested its policy decision on a basic mischaracterization of the Supreme Court's holding in *Local 1309* that wrongly equated not expressly requiring midterm bargaining with prohibiting it. The Policy Statement declares that "the Supreme Court held that the Statute does not clearly require or prohibit midterm bargaining." *Policy Statement*, 71

F.L.R.A. at 979. But the Supreme Court rejected the Fourth Circuit's view that the Statute prohibits midterm bargaining. *See Local 1309*, 526 U.S. at 91-92. The only question on remand to the Authority following the Court's *Local 1309* decision was whether the Statute recognizes a right to midterm bargaining or instead simply does not address it. *See id.* at 88. In miscasting *Local 1309* as leaving open whether the Statute "requires []or prohibits" midterm bargaining, 71 F.L.R.A. at 979, the Authority incorrectly suggested its decision struck a middle position on the issue.

*Second*, the Authority based its holding on an unsupported premise that its Policy Statement increased choice among the parties. It reasoned that "the Statute leaves midterm-bargaining obligations to the parties to resolve." *Policy Statement*, 71 F.L.R.A. at 979. But reversing *Interior* affected the default rule, which applies if the parties have not otherwise decided whether and how they will bargain midterm. The Authority did not explain how altering that default to empower the impasses panel to intervene and forbid or limit midterm bargaining increases party choice.

*Third*, even as it acted without advance notice or justification to abrogate its decades-old precedent in *Interior*, the Authority in the same breath described itself as taking no position on the issue *Interior* resolved. The Policy Statement commented that, following *Local 1309*, the Authority "could resolve" the textual ambiguity and "did so" in *Interior*, but that it now deemed it "more appropriate" to leave that question "to the parties." 71 F.L.R.A. at 979. But it did nothing of the sort. In fact, as discussed above, it flipped the baseline that the Authority, pursuant to the Supreme Court's remand, had set in *Interior* to hold instead that the Statute does not require midterm bargaining. Under the guise of neutrally declining to exercise the policy authority it wielded, the Authority answered

the precise question that it simultaneously said it "could" but did not resolve. *See id.*

The Authority also gave no hint in its public notice that it viewed the zipper clause question as opening the door to reconsidering its longstanding holding in *Interior*. It thus issued its Policy Statement without the benefit of public comment on *Interior*'s continued vitality. *See Policy Statement*, 71 F.L.R.A. at 984 & n.34 (Member DuBester, dissenting) (describing how commenters assumed *Interior*'s "well-established principle" was not up for reconsideration). But because we hold that the Authority's reasoning was deficient, we need not reach whether the rule might be procedurally defective on that ground.

The drive-by procedure and conclusory reasoning that produced the challenged Policy Statement is little match for the full process and detailed analysis that supported the Authority's determination in *Interior*. There, the Authority had deployed subject matter expertise to analyze the Statute and assess how best to structure the bargaining relationship. Here, the Authority did nothing of the sort. It dispensed with *Interior* in one paragraph of flawed textual analysis, devoid of any reasoned application of its labor relations expertise. Because the Policy Statement does not pass muster under *State Farm*, we need not reach the unions' contention that the Authority's change from its previously established position imposed any distinct burden of justification, *see* Pet'rs' Br. at 35-38, particularly whether the Authority implicitly contravened factual findings from *Interior* or unsettled strong reliance interests, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

The Authority's holding on the first step by which it structured its decision thus fails as unreasoned, so we vacate it.

**B. The Authority's Second Holding, Which It Expressly Rested on the First, Was Also Arbitrary and Capricious.**

The Authority next held that zipper clauses are mandatory bargaining subjects. Because the Authority rested this holding critically on the first, we must vacate it as well.

The Authority expressly framed its second, zipper-clause holding as dependent on and flowing from its reconsideration of *Interior*. The Authority found it "necessary" to reach its first holding in order to "properly evaluate" the zipper clause question. *Policy Statement*, 71 F.L.R.A. at 979 n.35. Then, after stating what counts as a unilateral right, the Authority made its second holding by cross reference: "As explained above," it wrote, zipper clauses must be mandatory bargaining subjects. *Id.* at 980. The Authority offered no other, independent rationale for its zipper clause holding.

Under the Authority's own decisional architecture, then, its second conclusion rests on its first. Bound as we are by the Authority's actual justification, *see Chenery II*, 332 U.S. at 196, we hold that the collapse of the first step brings the second down with it. *See also Am. Petroleum Inst.*, 862 F.3d at 71; *Davis*, 108 F.3d at 1459.

In a rationale offered as "further support" for its zipper clause holding—not as an alternative basis that could bear the holding's full weight absent the Authority's first holding—the Authority pointed to section 7114(a)(4). Nothing about that provision helps to distinguish mandatory bargaining subjects from permissive ones. The Statute there says that parties "may determine appropriate techniques . . . to assist in any negotiation." 5 U.S.C. § 7114(a)(4). The Authority reasoned that zipper clauses could constitute one such technique because they clarify the scope and timing of negotiations. *Policy*

*Statement*, 71 F.L.R.A. at 980. That reasoning is a *non sequitur*. The relevant question is whether the Statute explicitly or by unambiguous implication gives either party a right. If it does, that right is a unilateral right—even if doing away with it might simplify negotiations. In any event, the Authority did not present this "further support" for its Policy Statement as an alternative basis that could bear the full weight of its zipper-clause decision absent its first holding, so we cannot now view it that way. *See Chenery II*, 332 U.S. at 196.

\* \* \*

We grant the unions' petitions for review and vacate the Authority's decision in full.

*So ordered.*